Argued and submitted August 13, 2014, reversed and remanded November 4, 2015, petition for review allowed February 4, 2016 (358 Or 550)

Rob HANDY,
*Plaintiff-Appellant,*

*v.*

LANE COUNTY,
Jay Bozievich, Sid Leiken,
and Faye Stewart,
*Defendants-Respondents.*

Lane County Circuit Court
161213685; A153507

362 P3d 867

Marianne Dugan argued the cause and filed the briefs for appellant.

Stephen E. Dingle argued the cause for respondents. With him on the brief was Lane County Office of Legal Counsel.

Before Garrett, Presiding Judge, and Ortega, Judge, and DeVore, Judge.*

---

* Ortega, J., *vice* Haselton, C. J.

GARRETT, P. J.

Reversed and remanded.

**GARRETT, P. J.**

Plaintiff appeals a judgment that dismissed his claims against defendants for violations of the Public Meetings Law, ORS 192.610 - 192.690. Plaintiff alleges that defendants Lane County and three of the county's commissioners violated the Public Meetings Law by meeting in private for the purpose of deliberating toward a decision and by holding an emergency meeting without issuing minutes and without either giving 24-hour notice or justifying the lack of notice. Defendants moved to strike plaintiff's claims under ORS 31.150, Oregon's anti-SLAPP statute, which the trial court granted. For the reasons that follow, we conclude that plaintiff's first two claims are sufficient to survive an anti-SLAPP motion and that the trial court consequently erred in granting that motion and dismissing the complaint. We, therefore, reverse and remand.

## BACKGROUND

We view the facts in the light most favorable to plaintiff. *Neumann v. Liles*, 261 Or App 567, 570 n 2, 323 P3d 521, *rev allowed*, 356 Or 516 (2014) (reasoning that this approach is in accordance with the "legal standards governing special motions to strike under ORS 31.150").

Plaintiff is a former Lane County commissioner. Defendants are Lane County and three members of the county's board of commissioners. At the time pertinent to this appeal, plaintiff was in the final weeks of a campaign for reelection. Plaintiff was also attempting to repay to Lane County a personal debt of $20,000.[1] To raise funds to pay that debt, plaintiff solicited a local resident for a $3,000 contribution. In a hand-written letter to that resident, plaintiff wrote that a contribution could be made "confidentially and anonymously."

---

[1] That debt was the result of litigation brought by local residents against the Lane County Board of Commissioners and several individual commissioners, including plaintiff. The details of that litigation are not pertinent to this appeal, but as a result of the litigation, a stipulated judgment was entered that made the Lane County Board of Commissioners liable for $350,000. That judgment also required plaintiff and Commissioner Sorenson to each pay $20,000 to Lane County.

After receiving plaintiff's letter, on the morning of May 1, 2012, the recipient telephoned Alex Gardner, the Lane County district attorney (and, at the time, also county counsel), and expressed concern about plaintiff's solicitation. Gardner asked one of his investigators to collect the evidence and then contacted the Oregon Department of Justice to request that the department take control of the investigation. The next day, the recipient's attorney, Alan Thayer, sent a letter to plaintiff that alleged that plaintiff's solicitation violated government ethics and campaign finance laws and could constitute racketeering activity. Thayer's letter opined that the county might also be "at risk" if it were to accept payments from plaintiff in payment of his debt that plaintiff had incurred for violating the law. Thayer also sent a copy of the letter to Gardner.

That afternoon, reporters at KPNW radio and the Eugene Register-Guard newspaper sent public records requests to the county seeking copies of Thayer's letter. Gardner forwarded the Thayer letter to the county administrator, Liane Richardson. Richardson then had a series of communications with three members of the five-member county commission: Leiken, Bozievich, and Stewart, the individual defendants here. At that time, Leiken was the chair of the commission and Bozievich was the vice-chair. Together, they, along with Richardson, had the responsibility to schedule meetings and determine meeting agendas as the commission's "Agenda Team."

The evidence of the communications consists of a series of emails. The first email was the following, from Richardson to Leiken and Bozievich:

"Commissioners, I've now had a chance to review the letter we received today from Alan Thayer. Commissioner Stewart asked me about County liability. Commissioner Bozievich had the same concern when I spoke to him earlier. I would like to consult with Alex [Gardner] and/or Steve Dingle [Senior Assistant County Counsel], but at the very least it makes me concerned about what else may be occurring that we aren't aware of. I'd like to give some advice to Finance as to what they should do with the monies we've already received [on plaintiff's debt to the county]. I'm also concerned that it will look like we are trying to

hide something if we refuse the public records request. Our practice is to use the exceptions if they exist, but it feels wrong in this case. I'll consult with counsel on all of these issues and get back to you tomorrow."[2]

Twelve minutes later, at 7:50 p.m., Leiken sent a reply email to Richardson and Bozievich: "I just read the letter from Mr. Thayer and I am very concerned as well with regards to the county's potential liability. I will be in tomorrow morning and look forward to what you find out."

Early the next morning, May 3, at 5:56 a.m., Bozievich replied to Leiken's email. Bozievich wrote, "I will be available to come in the morning also. Looking forward to a quick decision on disclosure. * * * [I] do not want to be seen as covering up the receipt of funds from a possible illegitimate source." Richardson later forwarded the entire email chain to Dingle, writing, "[h]ere's the communications about calling an emergency session and the reason why. I called Commissioner Stewart to get his input, and then we scheduled it."

Between 7:09 a.m. and 7:30 a.m. on May 3, Gardner informed Richardson that Gardner would not release the Thayer letter in response to the media requests, but Gardner advised that the commission could make its own decision about whether to release the letter.[3] According to the declarations filed in support of the motion to strike, the Agenda Team members—Richardson, Leiken, and Bozievich—then conferred by telephone and agreed to schedule an emergency meeting of the board of commissioners at 9:00 a.m. At 7:41 a.m., Richardson directed county staff to email a notice of the emergency meeting to plaintiff and Commissioner Peter Sorenson. The notice said, "Commissioners, an Emergency meeting of the Board has been called for 9 a.m. today; the subject is Public Records Request." At 7:42 a.m., county staff also emailed the notice to members of the media.

At 9:00 a.m., the board commenced the emergency meeting. In attendance were administrator Richardson and

---

[2] Gardner and Dingle were copied on that email, as well as on the other emails among defendants that we discuss here.

[3] Gardner determined that it would be inappropriate for his office to release the letter in light of an investigation being conducted by the Oregon Department of Justice.

Leiken, Bozievich, and Stewart. Plaintiff and Sorenson did not attend. The meeting was broadcast live over a local television cable channel, recorded, and made available for viewing via a video link on the county's website. As the meeting began, Richardson announced that the purpose of the emergency meeting was to determine whether to release the Thayer letter in response to public records requests from the media. She explained that, after contacting the Agenda Team, "We decided to schedule this for a meeting as soon as possible because * * * I have received numerous calls now from the media asking for this."

The three commissioners present expressed their views that the letter was a public record and that it was a matter of public interest. They expressed concern for potential county liability arising from the acceptance of funds from plaintiff, in payment of his debt to the county, which he had received in violation of any campaign finance or ethical rules. On Bozievich's motion, the three commissioners voted unanimously to release the Thayer letter. The meeting adjourned at 9:17 a.m. At 9:24 a.m., Richardson emailed the Thayer letter to reporters.

Plaintiff sued Lane County and the three commissioners who attended the special meeting and voted to release the Thayer letter. Plaintiff's complaint alleges three claims for relief, all based on alleged violations of the Public Meetings Law. In the first claim for relief, plaintiff alleges that the May 3 emergency meeting violated procedural requirements in ORS 192.640(3) because defendants did not give at least 24-hours notice of the meeting, did not declare a justification for giving less than 24-hours notice, and did not issue minutes of the meeting. In his second claim for relief, plaintiff alleges that the three defendant commissioners violated ORS 192.630(2) by "conduct[ing] private meetings to deliberate or decide upon matters of public business." Specifically, the complaint alleges that the purpose of those meetings was "to meet on an emergency basis on May 3, 2012, and to respond to the public records request on May 3, 2012." In his third claim for relief, plaintiff requests that defendants be enjoined from committing further Public Meetings Law violations.

Defendants responded to plaintiff's complaint with a special motion to strike under ORS 31.150, the "anti-SLAPP" statute. Before the hearing on that motion, plaintiff requested that the court allow him to seek discovery from defendants.[4] At the hearing, the trial court denied plaintiff's motion to allow discovery, granted defendants' special motion to strike, and dismissed plaintiff's complaint. At a later hearing, the trial court also awarded defendants their attorney fees and costs pursuant to ORS 31.152(3). Plaintiff appeals, assigning error to the trial court's ruling dismissing his claims. He separately assigns error to the trial court's decisions not to allow further discovery and to award defendants their attorney fees and costs.

## DISCUSSION

Because plaintiff appeals the trial court's ruling under the "anti-SLAPP" statute, we begin with an overview of that statute. The acronym "SLAPP" stands for "Strategic Lawsuits Against Public Participation." *Staten v. Steel*, 222 Or App 17, 30, 191 P3d 778 (2008), *rev den*, 345 Or 618 (2009). Oregon, like some other states, has enacted an "anti-SLAPP" statute on the rationale that a SLAPP's purpose, rather than to bring a legitimate claim, is to chill a person's "participation in public affairs." *Clackamas River Water v. Holloway*, 261 Or App 852, 854 n 1, 322 P3d 614 (2014). We have explained that the anti-SLAPP statute is intended "to provide an inexpensive and quick process by which claims that might infringe on the right to petition and free speech on public issues could be evaluated to determine if they were frivolous." *Page v. Parsons*, 249 Or App 445, 461, 277 P3d 609 (2012).[5] The anti-SLAPP statute thus provides a mechanism that "allows defendants who claim that the litigation against them is a strategic attempt to chill their participation in public affairs to expeditiously obtain dismissal before

---

[4] The parties had not yet conducted any discovery when defendants filed their anti-SLAPP motion. Plaintiff, however, was able to obtain some documents through public records requests. Those documents are part of the record on appeal.

[5] As the California Court of Appeals has explained in construing a similar statute, a true SLAPP is a lawsuit "that lacks even minimal merit." *Greene v. Bank of America*, 216 Cal App 4th 454, 458, 156 Cal Rptr 3d 901 (2013) (internal quotation marks omitted).

incurring significant litigation expenses by filing, instead of an answer, a 'special motion to strike' the complaint." *Clackamas River Water*, 261 Or App at 854 n 1; *Staten*, 222 Or App at 32 ("The purpose of the special motion to strike procedure * * * is to expeditiously terminate *unfounded* claims that threaten constitutional free speech rights, not to deprive litigants of the benefit of a jury determination that a claim is *meritorious*." (Emphases in original.)).

The filing of a special motion to strike under ORS 31.150 triggers a two-step burden-shifting process:

"First, the court must determine whether the defendant has met its initial burden to show that the claim against which the motion is made 'arises out of' one or more protected activities described in subsection (2). Second, if the defendant meets its burden, 'the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case.' If the plaintiff succeeds in meeting that burden, the special motion to strike must be denied."

*Young v. Davis*, 259 Or App 497, 501, 314 P3d 350 (2013) (quoting ORS 31.150(3)).

The "protected activities described in subsection (2)" are oral or written statements made in governmental proceedings or in a public forum in connection with an issue of public interest, as well as any other exercise of the right of speech related to an issue of public interest.[6]

---

[6] Specifically, ORS 31.150(2) provides:

"A special motion to strike may be made under this section against any claim in a civil action that arises out of:

"(a)  Any oral statement made, or written statement or other document submitted, in a legislative, executive or judicial proceeding or other proceeding authorized by law;

"(b)  Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;

"(c)  Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or

"(d)  Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Although the statute refers to a plaintiff's need to show a "probability" of prevailing on the claim in order to proceed, we have interpreted that standard, in this context, as a "low bar." *Young*, 259 Or App at 508.[7] To clear that low bar, a plaintiff has the burden of presenting substantial evidence to support a *prima facie* case against the defendant. *Id*. Typically, a plaintiff will not have access to discovery before being required to defend against a special motion to strike. *See* ORS 31.152(2) ("All discovery in the proceeding shall be stayed upon the filing of a special motion to strike under ORS 31.150."). Therefore, a plaintiff may meet the burden of production by producing direct evidence, reasonable inferences that may be drawn from that evidence, and "affidavits setting forth such facts as would be admissible in evidence." *OEA v. Parks*, 253 Or App 558, 567, 291 P3d 789 (2012), *rev den*, 353 Or 867 (2013). "[T]he trial court may not weigh the plaintiff's evidence against the defendant's" and "may consider defendant's evidence only insofar as necessary to determine whether it defeats plaintiff's claim as a matter of law." *Young*, 259 Or App at 509-10.

We review a trial court's ruling on an anti-SLAPP motion to strike for legal error. *Neumann*, 261 Or App at 572-73. With that in mind, we turn to the claims that the trial court struck in this case. As noted earlier, plaintiff alleges both a violation of certain procedural requirements in connection with the holding of the emergency board meeting (the "emergency meeting claim") and a violation of the statutory prohibition against private deliberations or decisions (the "private deliberations claim"). We address the latter claim first.

## A. *Private Deliberations Claim*

On appeal, plaintiff concedes that defendants met their burden of making a *prima facie* showing that his private deliberations claim arises out of a statement, document, or conduct described in ORS 31.150(2), the first step

---

[7] In *Young*, we approvingly cited the standard of review that was explained in *Greene*. Under that standard, courts considering a defendant's anti-SLAPP motion "do not weigh credibility, nor *** evaluate the weight of the evidence." 216 Cal App 4th at 458. Instead, courts will "accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." *Id*.

required in the anti-SLAPP analysis. Because the parties have not addressed that issue on appeal, we assume, without deciding, that the claim is subject to ORS 31.150. *See Neumann*, 261 Or App at 574, and *Young*, 295 Or App at 505 (declining to address whether a claim arises out of conduct described in ORS 31.150(2) because parties failed to provide properly focused arguments on the issue); *see also State v. Brand*, 257 Or App 647, 651, 307 P3d 525 (2013) (it is not our "function to make or develop a party's argument when that party has not endeavored to do so itself"). Thus, we proceed with our discussion of whether plaintiff has met his burden of establishing "that there is a probability that [he] will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). That is, has plaintiff met his burden of providing enough evidence to support his claim that defendants violated the Public Meetings Law by meeting in private for the purpose of deliberating toward a decision, as prohibited by ORS 192.630(2)?

ORS 192.630(2) provides that "[a] quorum of a governing body may not meet in private for the purpose of deciding on or deliberating toward a decision on any matter except as otherwise provided by ORS 192.610 to 192.690." In his complaint, plaintiff alleges that "defendants conducted private meetings to deliberate or decide upon matters of public business. On May 2, 2012, the individual defendants and certain of their agents met through email, telephone, and perhaps in person, to deliberate toward decisions regarding [plaintiff]." According to the complaint, those "decisions" were "to meet on an emergency basis on May 3, 2012, and to respond to the public records request on May 3, 2012." On appeal, plaintiff explains his theory as follows:

> "[T]he defendants violated ORS 192.630(2) and ORS 192.670[8] because a quorum of the Commissioners (the individual defendants) conducted meetings in private for the purpose of deciding or deliberating toward the decision to meet in emergency session on May 3 (and also deliberated prior to that meeting about whether to release the document)."

(Internal quotation marks and underscoring omitted.)

---

[8] ORS 192.670 clarifies that the requirements of ORS 192.630 apply to meetings conducted "through the use of telephone or other electronic communication."

As explained further below, the meaning of the terms "meet," "meeting," "deciding," and "deliberating" are central to the issues in this case. Preliminarily, however, we note that plaintiff argues that defendants violated ORS 192.630(2) in two distinct ways: first, by privately "deciding or deliberating toward the decision to meet in emergency session" and, second, by privately "deliberat[ing] prior to that meeting about whether to release the [Thayer letter]." On appeal, defendants address the first theory but not the second.

Defendants argue that the Public Meetings Law does not prohibit private discussions about purely administrative matters such as "whether the situation faced by the County justified calling an emergency meeting." We agree that plaintiff cannot base his claim for a violation of the Public Meetings Law on the premise that defendants discussed whether to hold an emergency meeting. ORS 192.630(2) provides that a quorum of a governing body may not meet in private if their purpose is to "decid[e] on or deliberat[e] toward a decision." A decision is statutorily defined as "any determination, action, vote or final disposition upon a motion, proposal, resolution, order, ordinance or measure *on which a vote of a governing body is required, at any meeting at which a quorum is present.*" ORS 192.610(1) (emphasis added). As defendants point out, a decision to hold a special or emergency meeting of the Lane County Commission is not a "decision" within the statutory definition because it does not require a "vote" by the commission; such a meeting may be called by the chair unilaterally. *See* Home Rule Charter for Lane County, § 13(4) ("The chair of the board may, by giving notice thereof to all members of the board then in the county * * * call a special meeting of the board.").[9] In short, to the extent that plaintiff's claim under ORS 192.630(2) rests on the individual defendants' private conversations about whether to schedule a meeting, we agree that the claim lacks even minimal merit and was properly struck by the trial court.

---

[9] It is far from clear that the mere act of discussing whether to hold a meeting could ever constitute a violation of the Public Meetings Law. We need not resolve that question in the abstract, however, in light of what the Lane County Charter states.

But plaintiff's claim under ORS 192.630(2) is not limited to the allegation that defendants privately discussed whether to hold a meeting. Rather, plaintiff expressly alleges that the objectionable discussions touched on the substantive question of how to "respond to the public records request." Unlike the decision to schedule a meeting, it appears from the record that the decision to release the Thayer letter was one that implicates the Public Meetings Law because it was one for which "a vote of a governing body is required, at any meeting at which a quorum is present." ORS 192.610(1). Defendants determined that a vote of the board was necessary in order to release the Thayer letter; that is why the meeting was scheduled.

For several reasons, however, the analysis as to whether the Public Meetings Law was actually violated is complicated. There is no evidence in the record that a quorum of the commission actually met privately at the same time and place to discuss the Thayer letter, and plaintiff does not contend otherwise. Rather, he argues that, through a series of person-to-person conversations and group email messages over a short period of time, a quorum deliberated toward a decision on that issue. As evidence for that claim, defendant points to (1) the conversation between Richardson and Stewart, (2) the conversation between Richardson and Bozievich, and (3) the email exchange among Richardson, Bozievich, and Leiken in which the conversation between Richardson and Stewart is mentioned. Based on that evidence, three of the five commissioners (a quorum) were involved in the discussions, but no more than two of them were involved in any single communication.

Thus, the viability of plaintiff's theory depends on the resolution of at least two separate questions under the Public Meetings Law. The first is whether that series of communications, each comprising less than a quorum, may be, in effect, aggregated so as to implicate a quorum for purposes of the statute. If the answer to that question is "no," then plaintiff's claim must fail because he has failed to adduce any evidence that a quorum did anything contemporaneously in private. If the answer to that question is "yes," however, then the second question is whether plaintiff has produced sufficient evidence (at this very early stage of the

litigation) that the content of those discussions rose to the level of what the Public Meetings Law prohibits—that is, privately "deciding on or deliberating toward a decision." Unfortunately, defendants ignore all of those questions on appeal. We, however, must resolve them in order to determine whether the trial court erred in granting the special motion to strike.

The threshold question is whether ORS 192.630(2) can be implicated by a series of conversations that involve a quorum only when they are considered as a whole. No Oregon appellate case has addressed whether the statute applies to such "serial" discussions. Therefore, consistently with our obligation to interpret statutes correctly, we proceed to construe ORS 192.630(2). *See Stull v. Hoke,* 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties.").

The goal of our methodology of statutory construction is "to discern what the legislature that enacted the statute in question had in mind at the time the legislature enacted the statute at issue." *Arken v. City of Portland,* 351 Or 113, 133, 263 P3d 975, *adh'd to on recons sub nom Robinson v. Public Employees Retirement Board,* 351 Or 404, 268 P3d 567 (2011). To do so, we first examine the text of the statute and its context. *State v. Gaines,* 346 Or 160, 171, 206 P3d 1042 (2009). "Context includes other provisions of the same statute and other related statutes." *Holm and Holm,* 323 Or 581, 586, 919 P2d 1164 (1996). The court also considers legislative history "where that legislative history appears useful to our analysis." *Gaines,* 346 Or at 172. If, after consideration of text, context, and legislative history, the intention of the legislature remains unclear, "then the court may resort to general maxims of statutory construction to aid in resolving the remaining uncertainty." *PGE v. Bureau of Labor and Industries,* 317 Or 606, 612, 859 P2d 1143 (1993). Of particular importance here is the rule of construction that the court is "not to omit what has been inserted, and [the court is] to construe multiple provisions, if possible, in a manner that will give effect to all." *Bolt v. Influence, Inc.,* 333 Or 572, 581, 43 P3d 425 (2002) (citing ORS 174.010).

Again, ORS 192.630(2) provides that "[a] quorum of a governing body may not meet in private for the purpose of deciding on or deliberating toward a decision on any matter except as otherwise provided by ORS 192.610 to 192.690." To "meet" means "to join (a person) in conversation, discussion, or social or business intercourse : enter into conference, argument, or personal dealings with." *Webster's Third New Int'l Dictionary* 1404 (unabridged ed 2002). According to that definition, people "meet" when they enter into any conversation, discussion, conference, or other personal dealings with at least one other person. Of course, when members of a governing body meet in private, they do not automatically violate ORS 192.630(2). That section is violated only if: (1) the members who meet constitute a quorum, (2) they meet in private, and (3) they meet "for the purpose of deciding on or deliberating toward a decision."[10]

Although the verb "meet" is not defined in the statute, the statute does provide a definition of the noun "meeting," which is used in subsection (1). Thus, we first consider subsection (2)'s use of "meet" in the context of subsection (1)'s use of "meeting." *See State v. Leslie,* 204 Or App 715, 721, 132 P3d 37, *rev den,* 341 Or 245 (2006) ("As a general matter of statutory construction, we ordinarily assume that, when the same statute uses closely similar terms, those terms have a consistent meaning throughout.").

Subsection (1) provides that "[a]ll *meetings* of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by ORS 192.610 to 192.690." (Emphasis added.) "'Meeting' means the *convening* of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter." ORS 192.610(5) (emphasis added).

___

[10] A decision is defined as "any determination, action, vote or final disposition" by the governing body. ORS 192.610(1). The term "deliberate" is not defined by statute. That word is commonly used to mean "to ponder or think about with measured careful consideration and often with formal discussion before reaching a decision or conclusion." *Webster's* at 596. Our case law has similarly interpreted "deliberate" to mean to "weigh evidence for or against choices and make a decision." *Oregonian Publishing Co. v. Board of Parole,* 95 Or App 501, 505, 769 P2d 795 (1989).

When used in connection with a group of people, the term "convening" means "to meet in formal session" or to cause people "to assemble in a group or body." *Webster's* at 497. Thus, the word "convening" implies a formal assembly at the same place and at the same time. It follows that ORS 192.630(1), by referring to "meetings," applies to contemporaneous gatherings of a quorum. To prove a violation of ORS 192.630(1), therefore, a plaintiff must establish (1) that a quorum of a governing body convened (*i.e.*, gathered contemporaneously), (2) to "make a decision or to deliberate toward a decision on any matter," and (3) that the meeting was not "open to the public."

Returning to ORS 192.630(2), that subsection provides that "[a] quorum of a governing body may not *meet* in private for the purpose of deciding on or deliberating toward a decision on any matter[.]" (Emphasis added.) If we were to interpret "meet" in that phrase with reference to the defined term "meeting" in the preceding subsection, then, to prove a violation of subsection (2), a plaintiff would have to establish (1) that a quorum of a governing body convened (*i.e.*, gathered contemporaneously), (2) in "private," (3) "for the purpose of deciding on or deliberating toward a decision on any matter." Those three elements are the same as the elements of subsection (1). Thus, to treat the phrase "may not meet" in subsection (2) as equivalent to the phrase "may not have a meeting" would reduce subsection (2) to a restatement of the rule already announced in subsection (1). Our maxims of statutory construction counsel us to avoid such results when possible. *See Bolt*, 333 Or at 581.[11]

The understanding that ORS 192.630(2)'s reference to "meet" may require a separate analysis from whether a

---

[11] Moreover, if the legislature had intended the word "meet" in subsection (2) to be understood with reference to the narrow definition of "meeting" in subsection (1), there would have been no need for subsection (2) to include the qualifying phrase "decide or deliberate toward a decision," because that phrase is already encompassed within the statutory definition of "meeting." The dissent would explain such redundancy by suggesting that the legislature intended a "belt and suspenders" understanding, with the same concept expressed in both "positive" and "negative" terms. 274 Or App at 685-86, (DeVore, J., dissenting). But that is not how we typically interpret statutes. *Bolt*, 333 Or at 581 (we "construe multiple provisions, if possible, in a manner that will give effect to all").

"meeting" occurred under ORS 192.630(1) was implicit in *Harris v. Nordquist*, 96 Or App 19, 21, 771 P2d 637 (1989). In *Harris*, the plaintiffs alleged that individual members of their local school board had met informally at various restaurants to discuss school board business. Plaintiffs argued that those gatherings violated ORS 192.630(2) as well as ORS 192.650—which requires "sound, video or digital recording or the taking of written minutes" at all "meetings" of a governing body. *Id.* at 23. In determining that ORS 192.650 was not violated, we concluded that the gathering of board members at a restaurant before or after an "official" meeting was not a "meeting" because it was "not 'the convening' of the body 'for which a quorum is required in order to make a decision or deliberate toward a decision.'" *Id.* at 24 (quoting ORS 192.610(5)). We went on to explain that, "[f]urthermore, if the private gathering of a quorum at the restaurant took place to decide or deliberate toward a decision, it would have been prohibited by ORS 192.630(2), and ORS 192.650 does not require minutes of prohibited gatherings." *Id.*

We then considered whether "the private gathering of a quorum at the restaurant took place to decide or deliberate toward a decision" in violation of ORS 192.630(2). *Id.* We noted that the only evidence in the record about the content of the conversations was that they discussed in general terms "'what was going on at the schools.'" *Id.* at 25. There was no evidence that the school board members ever talked about "a matter to be decided by the board." *Id.* Because there was no evidence of any private deliberations towards a "decision," we affirmed the trial court's grant of summary judgment against the plaintiffs. *Id.* Of course, if the fact that the gathering was not a "meeting" for purposes of ORS 192.630(1) was also determinative of liability under ORS 192.630(2), there would have been no need to undertake the analysis of whether "deliberation" had occurred. Our approach thus reflects the understanding that subsections (1) and (2) regulate different things. The legislature was not content to require that "meetings" be made open to the public; rather, to achieve the statutory purpose, the legislature felt the need to regulate the conduct of public officials in less formal settings.

The legislative history of ORS 192.630(2) supports the analytical approach in *Harris.* ORS 192.630(2) originated as part of the bill that created Oregon's Public Meetings Law in 1973. Or Laws 1973, ch 172, § 3. That bill contained another provision, which ultimately would become ORS 192.630(1), which provided that "[a]ll meetings of the governing body of a public body shall be open to the public and all persons shall be permitted to attend any meeting except as otherwise provided by this Act." *Id.* During committee hearings on the bill in the Joint Special Committee on Professional Responsibility (JSCPR), there was much discussion about how to define the word "meeting." Ultimately, the committee settled on the following definition: " 'Meeting' means the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate towards a decision on any matter. Meeting does not include any on-site inspection of any project or program." The members of the committee, however, were not fully satisfied with how that definition of the term meeting would work in conjunction with the operative section of the bill that required that "all meetings * * * shall be open to the public." One of the committee members, Senator Wallace Carson, opined that a definition of the word "meeting" that included the word "convening" was problematic because convening implies a formal gathering. Tape Recording, JSCPR, Senate Bill (SB) 15, Mar 19, 1973, Tape 3, Side 2. One of the co-chairs, Senator Jack Ripper, replied that the bill could refer instead to "formal and informal convening" to ensure that the bill would cover situations involving informal gatherings. *Id.*

At the end of that discussion, Jim Durham, a representative of the attorney general, was asked to discuss an alternative public meeting bill that the Attorney General had proposed. *Id.* Durham explained that the text of the Attorney General's bill provided that no governing body "shall meet privately for the purpose of discussing or conducting public business." *Id.* Durham opined that adding that text to the bill being considered by the committee would broaden the bill. *Id.* Ripper suggested that the text be added to the end of the definition of the term "meeting." *Id.* Ultimately, however, it was decided that that prohibition would be added as

a stand-alone provision of the bill. *Id*. That subsection would become the one at issue here, ORS 192.630(2).[12]

Neither *Harris* nor the legislative history directly addresses the question raised in this case: May ORS 192.630(2) be violated by "deliberation" among a group of members constituting a quorum even if the quorum is not all together at the same time and place? It is instructive, however, that the legislators who drafted ORS 192.630(2) did so to broaden the scope of the Public Meetings Law to ensure that the law would regulate conduct by public officials outside the context of formal meetings. Consistent with that legislative history, *Harris* stands for the proposition that a quorum of a governing body may violate ORS 192.630(2) by "deliberating" privately in an informal setting, but also that not every discussion among a quorum, even on matters of public concern, will violate the statute. Rather, the discussion must rise to the level of, *and* have the purpose of, "deciding on or deliberating toward a decision." *See Harris*, 96 Or App at 25 ("Information gathering is distinct from deliberating."). Those authorities lead us to conclude that a violation of ORS 192.630(2) depends not on the method by which communications take place, but, rather, on the purpose and content of those communications.

We also rely on the legislature's explicit declaration of the objective of the Public Meetings Law. The legislature included a statement of policy when it first enacted the statute. Or Laws 1973, ch 172, § 1. According to ORS 192.620, "The Oregon form of government requires an informed public aware of the deliberations and decisions of governing bodies and the information upon which such decisions were made. It is the intent of ORS 192.610 to 192.690 that decisions of governing bodies be arrived at openly." That statement reveals that the legislature meant to promote public awareness of how public bodies reach decisions, not just the

_____

[12] If, as the dissent suggests, the purpose of ORS 192.630(2) was simply to reinforce ORS 192.630(1) by clarifying that the prohibition on private meetings was not limited to "ceremonial" meetings, then the legislature could have expressed its intent in a simpler and more straightforward manner by adopting the suggestions before the committee that would have expanded the statutory definition of "meeting." 274 Or App at 682 (DeVore, J., dissenting). The rejection of that approach in favor of the stand-alone prohibition in subsection (2) indicates that the legislature had a broader objective in mind.

results of those discussions. As we have observed before, that policy statement requires that the court analyze "the coverage of the act broadly and its exemptions narrowly." *Oregonian Publishing Co.*, 95 Or App at 506.

The legislative objective could be easily defeated if the statute rigidly applied only to contemporaneous gatherings of a quorum. For example, officials could be polled through an intermediary. In group email messages, officials could deliberate and declare their positions on upcoming issues. The same could be done through rapid, serial, group text messages in the moments before convening for an official meeting. In those examples, a quorum would have "deliberated" or "decided" the matter in "private" just as effectively as if all of the members had gathered secretly in a room and reached agreement before the public meeting. Given the purpose of the statute, we see no reason to treat those situations differently.

The California courts have similarly interpreted that state's Brown Act, which was the model for Oregon's Public Meetings Law. Tape Recording, JSCPR, SB 15, Feb 26, 1973, Tape 2, Side 1 (statement of Sen Fred Heard). The influence of the California statute can be seen in the text of the Oregon statute. At the time that Oregon enacted its Public Meetings Law, California had a statutory section that was very similar to ORS 192.630(1). The California statute provided:

> "All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided in this chapter."

Cal Gov't Code § 54953 (1953).

A line of California cases provides some helpful additional context for the discussions that occurred in the Oregon Legislature in 1973 and further supports the conclusion that Oregon's statute should be interpreted to cover serial meetings that evidence "deliberation" by a quorum. In 1960, the California Courts of Appeal issued an opinion that interpreted the term "meeting" very narrowly. That case concluded that "the language of the Brown Act was not

directed at anything less than a formal meeting of a city council or one of the city's subordinate agencies." *Adler v. City Council of City of Culver City*, 184 Cal App 2d 763, 770, 7 Cal Rptr 805 (1960).

After the *Adler* decision, the California State Assembly in 1961 amended the Brown Act:

> "Following a narrow judicial construction of the word 'meeting' (*Adler v. City Council* (1960) 184 Cal App 2d 763, [7 Cal Rptr 805]), the Legislature amended the Brown Act to make clear that legislative action within the act was not necessarily limited to action taken at a formal meeting. Section 54952.6, added in 1961, provides that '"action taken"' means (1) 'a collective decision made by a majority of the members of a legislative body,' (2) 'a collective commitment or promise by a majority of the members of a legislative body to make a positive or a negative decision,' or (3) 'an actual vote by a majority of the members of a legislative body when sitting as a body or entity, upon a motion, proposal, resolution, order or ordinance.' (Stats. 1961, ch. 1671, § 3.)"

*Stockton Newspapers, Inc. v. Members of Redevelopment Agency*, 171 Cal App 3d 95, 101, 214 Cal Rptr 561 (1985). Thus, at the time that Oregon was expressly modeling its Public Meetings Law on California's Brown Act, the Brown Act had been amended for the specific purpose of ensuring that the act would cover both formal and informal meetings; the relevant question was not whether it was possible for official action to be taken, but whether it was possible for a "collective commitment" or "collective decision" to be made.

In *Stockton Newspapers*, the court reasoned that a quorum may make a collective commitment or decision without meeting contemporaneously. In that case, the plaintiff alleged that defendants, the members of the governing body of a redevelopment agency, violated the Brown Act when the agency's attorney contacted each member individually by telephone "for the purpose of obtaining a collective commitment or promise by said defendants to approve the transfer of ownership of real property forming part of a planned waterfront development." *Id.* at 99 (internal quotation marks omitted). The trial court dismissed the complaint for failure to state a claim. The California Courts of Appeal reversed:

"[T]he concept of 'meeting' under the Brown Act comprehends informal sessions at which a legislative body commits itself collectively to a particular future decision concerning the public business. Considering the ease by which personal contact is established by use of the telephone and the common resort to that form of communication in the conduct of public business, no reason appears why the contemporaneous physical presence at a common site of the members of a legislative body is a requisite of such an informal meeting. Indeed if face-to-face contact of the members of a legislative body were necessary for a 'meeting,' the objective of the open meeting requirement of the Brown Act could all too easily be evaded."

*Id.* at 102;[13] *see also Roberts v. City of Palmdale*, 5 Cal 4th 363, 376, 853 P2d 496 (1993) (reasoning that "the intent of the Brown Act cannot be avoided by subterfuge; a concerted plan to engage in collective deliberation on public business through a series of letters or telephone calls passing from one member of the governing body to the next would violate the open meeting requirement").

The dissent is correct that *Stockton Newspapers*, which was decided after Oregon adopted its Public Meetings Law, cannot directly aid our understanding of our legislature's intention. 274 Or App at 689 (DeVore, J., dissenting). Nonetheless, that case, as well as *Roberts*, helps to illustrate the central problem with the dissent's proposed "bright-line rule": the ease with which the statutory prohibition could be rendered nearly meaningless if it applied only to contemporaneous gatherings.

In short, the text, structure, context, purpose, and history of the Public Meetings Law indicate that the prohibition in ORS 192.630(2) contemplates something more than just a contemporaneous gathering of a quorum. A series of discussions may rise to the level of prohibited "deliberation" or "decision"; the determinative factors are whether a sufficient number of officials are involved, what they discuss, and the purpose for which they discuss it—not the time, place, or

---

[13] After *Stockton Newspapers*, the California State Assembly amended the Brown Act to clarify that the law prohibits the "use of direct communication, personal intermediaries, or technological devices * * * to develop a collective concurrence as to action to be taken on an item." 1993 Cal Legis Serv ch 1137 (Senate Bill 36).

manner of their communications. In the absence of explicit textual or historical support for the notion that the Oregon legislature intended ORS 192.630(2) to apply only where a quorum is contemporaneously present, it makes little sense to engraft such a rigid criterion onto a statute that we are called upon to interpret "broadly." *Oregonian Publishing Co.*, 95 Or App at 506.

We understand the dissent to be worried primarily that, without a bright-line rule limiting the coverage of the law to contemporaneous gatherings of a quorum, public officials will be uncertain about what they can and cannot do, and will face an excessive risk of liability arising out of one-on-one conversations with their colleagues. 274 Or App at 689-90 (DeVore J., dissenting). There are several responses to that concern.

First, we doubt that many public officials throughout Oregon presently hold the view that they may skirt the Public Meetings Law by taking decisive action in private, so long as they are careful about how many people are in the room at one time. In fact, they are already cautioned that they should not do so, at least for reasons of policy and appearance. *See* Oregon Department of Justice, 2014 Public Records and Meetings Manual at 137 (noting that "members of a governing body should not gather as a group or groups composed of less than a quorum for the purpose of conducting business outside the Public Meetings Law").

Second, public officials must already live with ambiguity under the Public Meetings Law, largely because of the statute's emphasis on the "purpose" of a discussion. As *Harris* illustrates, a gathering of a quorum is lawful so long as it is social, even if members discuss matters of concern to their public body—but may instantly become unlawful if the discussion takes on a character that (with judicial hindsight) appears deliberative in "purpose." If, therefore, it is undesirable that public officials lack greater certainty about the extent to which they can discuss public matters out of the public eye, that problem existed long before today. True, our interpretation will now at least marginally increase the uncertainty for public officials by denying a safe harbor that the dissent would offer so long

as a quorum does not meet contemporaneously. For reasons already stated, however, we believe that that safe harbor would frustrate the legislature's declared purpose so completely that it must be rejected in the absence of a clear statutory command.[14]

Third, we respectfully disagree that members of a public body will now be too chilled to "talk any business with another member in the hallway, on the telephone, by email, or anywhere other than at a public meeting." 274 Or App at 692 (DeVore, J., dissenting). Again, ORS 192.630(2) places the focus squarely on the *purpose* for which communication occurs, and we have already noted the distinction between deliberation and "[i]nformation gathering." *Harris*, 96 Or App at 25. A *prima facie* case for violation of ORS 192.630(2) will have to show more than that two public officials spoke privately on a matter of public concern, or even about an upcoming vote. The prohibition addresses not all private, serial communications among members who constitute a quorum, but those conducted for the "purpose" of deliberation or decision. We are not called upon at this stage of this case to decide what types of evidence would be necessary to support such a finding, but it seems clear that a plaintiff will need to show some evidence of coordination, orchestration, or other indicia of a "purpose" by a quorum to deliberate or decide out of the public eye. Thus, we do not believe that the statute's reference to "purpose" implies the broad range of interactions contemplated by the dissent. The main import of today's decision is that public officials cannot avoid the requirements of the Public Meetings Law through "subterfuge." *Roberts*, 5 Cal 4th at 376.

Having so interpreted ORS 192.630(2), we return to the record before us. Plaintiff has produced evidence that three commissioners (Bozievich, Leiken, and Stewart) had discussions either with each other or with Richardson, the county administrator, about whether to release the Thayer letter. We know little of the content of those discussions. Bozievich's email to Leiken and others at 5:56 a.m. on May 3, said that Bozievich was "[l]ooking forward to a quick

---

[14] Even the dissent, as we understand it, does not contend that the statutory text unequivocally compels the dissent's interpretation. Rather, the dissent relies heavily, as we do, on other sources of understanding the legislature's intent.

decision" on whether to disclose the letter, juxtaposed with a comment that he did not want to be seen as "covering up" the receipt of funds. Those comments permit an inference, at least at this stage, that Bozievich had already decided to vote to release the letter, in consultation with others. One of Richardson's emails mentions that she spoke to Stewart to get his "input" and that the meeting was then scheduled. In context, that could mean either that Richardson solicited Stewart's opinion on whether to schedule a meeting *or* that she obtained his input on the substantive question of whether to release the letter. All three commissioners expressed similar concerns about "county liability," and all three voted to release the letter.

Viewed in the light most generous to plaintiff's theory of liability, those facts would support an inference—at this nascent stage of the litigation—that the three commissioners at least "deliberated," in a series of telephone calls and emails over the course of several hours, toward the final "decision" to release the Thayer letter, and perhaps even made that decision. If those discussions had that purpose, it is not material that some of the discussions occurred electronically or through Richardson as an intermediary.

To be clear, we express no view on the ultimate question of whether defendants violated ORS 192.630(2). It may well be that defendants will later be entitled to judgment as a matter of law, if, after discovery, plaintiff cannot show that defendants' private communications had the purpose of "deliberation" or "decision." *See Harris*, 96 Or App at 25 ("Information gathering is distinct from deliberating."). But this case is before us in the context of a special motion to strike under the anti-SLAPP statute, before discovery has even occurred. In this posture, we are unable to conclude from the existing record that plaintiff's claims are devoid of merit.

For the foregoing reasons, we conclude that the trial court erred by granting defendants' special motion to strike under ORS 31.152.

B. *Emergency Meeting Claim*

Plaintiff alleges that the May 3 emergency meeting was procedurally deficient because (1) no minutes were made

for the meeting, contrary to ORS 192.650, and (2) defendants did not issue a statement describing an emergency justifying less than 24-hour notice, contrary to ORS 192.640(3). As a remedy for those alleged violations, plaintiff requested that the board's decision to release the Thayer letter be voided under ORS 192.680(3).[15] The trial court struck that claim under the anti-SLAPP statute.

As mentioned above, to be subject to the anti-SLAPP statute, a claim must "arise out of" one or more protected activities described in ORS 31.150(2). *Young*, 259 Or App at 501. Those activities are: (1) any "statement made" during, or in connection with, a legislative, executive, or judicial proceeding; (2) a "statement made * * * in connection with an issue of public interest"; and (3) any other conduct "in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." ORS 31.150(2).

Here, the trial court reasoned that the anti-SLAPP statute applied because the "gravamen of plaintiff's complaint is the decision to release the letter regarding allegations against plaintiff."[16] We understand the trial court to mean that plaintiff's claim arose out of one of the enumerated protected activities because plaintiff's motivation in bringing his suit was to attack the board's decision to release the Thayer letter.

But just because plaintiff sought, as a remedy, to have the result of the emergency meeting voided does not

---

[15] ORS 192.680(3) provides that, if a court finds that a public body made a decision while violating the Public Meetings Law, "the court shall void the decision of the governing body if the court finds that the violation was the result of intentional disregard of the law or willful misconduct by a quorum of the members of the governing body, unless other equitable relief is available."

[16] In its letter opinion, the court elaborated:

"[Plaintiff] asks that [the] decision [of May 3, 2012, to release the letter] be voided, a request that is inconsistent with his argument that he is only attacking the procedural deficiencies of setting the emergency meeting, setting forth the reasons for the emergency meeting, or what happened during a discussion the day before the emergency meeting.

"* * * [T]his is not the type of case where plaintiff is merely seeking to require defendants to follow the mandate of an act of governance. It is directly attacking the discussion and decision made by defendants regarding an issue of public interest, *i.e.*, a letter making allegations about plaintiff. That attack is on defendants' right to speech."

mean that his claim arose out of one of the protected activities listed in ORS 31.150(2). Whether a plaintiff's claim "arises out of" a statement or conduct subject to the anti-SLAPP statute turns on the factual basis for the claim, not a plaintiff's underlying motivation to bring the claim. *See Mullen v. Meredith Corp.*, 271 Or App 698, 705-07, 353 P3d 598 (2015) (concluding that defendants' conduct arose out of one of the activities described in ORS 31.150(2) irrespective of the conduct alleged to be wrongful and intentional); *see also Drell v. Cohen*, 232 Cal App 4th 24, 30, 181 Cal Rptr 3d 191 (2014) (California courts consider "the specific acts of alleged wrongdoing" when considering whether a claim arises out of a protected activity in that state's similarly worded anti-SLAPP statute).

Plaintiff's claim under ORS 192.640(3) alleges that defendants failed to make minutes for the meeting and to adequately describe an emergency that justified giving less than 24-hour notice. In other words, the factual basis for plaintiff's claim is defendants' alleged failure to comply with the statutory requirements for holding an emergency meeting, alleged violations that were not the commission of any statement or conduct that falls within one of the activities described in ORS 31.150(2). Consequently, defendants have not met their burden of showing that plaintiff's first claim is subject to Oregon's anti-SLAPP statute.[17] The trial court erred by concluding otherwise and striking plaintiff's emergency meeting claim.

For the foregoing reasons, we conclude that the trial court erred in granting defendants' special motion to strike. We also, therefore, vacate the trial court's award of attorney fees to defendants, which was based on defendants having prevailed on their motion. We do not address plaintiff's discovery claim because our disposition of this case will allow him to have discovery.

Reversed and remanded.

---

[17] In *Digerati Holdings, LLC v. Young Money Entm't, LLC*, 194 Cal App 4th 873, 885-86, 123 Cal Rptr 3d 736 (2011), the California Court of Appeals likewise held that there was no indication that a musician's alleged failure to give contractually required interviews "involved any written or oral statement *** or any other conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue or an issue of public importance."

**DEVORE, J.,** concurring and dissenting.

This case poses two troubling prospects. One is that a government body would use a special motion to strike under ORS 31.150 to respond to a citizen's suit over public meeting standards and then readily inflict the government's attorney fees on the unsuccessful citizen for daring to enforce Oregon's Public Meetings Laws, ORS 192.610 to 192.690. I join the majority in rejecting Lane County's attempt to employ such a motion under Oregon's anti-SLAPP statute ("Strategic Lawsuits Against Public Participation") against plaintiff's claim of an improper emergency meeting.

The second troubling prospect is that separate conversations or messages of members of a governing body, occurring at different times and places, could be aggregated, after the fact, so as to permit a court to conclude that, in violation of law, a quorum of the public body had "met" as a quorum to deliberate toward a decision. I respectfully dissent from the majority's conclusion that embraces that prospect. I believe that the majority's conclusion is contrary to statutory text and legislative history, and I fear that this new definition of "meet" will trouble governing officials around the state with a vague, "gotcha" standard.

## I. ANTI-SLAPP STATUTE

### A. *Inapplicable to "Emergency Meeting Claim"*

Plaintiff's first claim alleged that the emergency meeting of May 3 failed to comply with ORS 192.640(3), because the law permits only public meetings with less than 24 hours' notice "[i]n case of an *actual* emergency" and provided that "the minutes for such a meeting shall describe the emergency justifying less than 24 hours' notice."[1] (Emphasis added.) Among other things, plaintiff alleged that defendants had issued no statement at the meeting describing

---

[1] ORS 192.640(3) provides,

"No special meeting shall be held without at least 24 hours' notice to the members of the governing body, the news media which have requested notice and the general public. In case of an actual emergency, a meeting may be held upon such notice as is appropriate to the circumstances, but the minutes for such a meeting shall describe the emergency justifying less than 24 hours' notice."

the emergency and that they had no actual reason justifying less than 24-hour notice. As the May 3 meeting had begun, the county administrator Richardson had explained that, after contacting the Agenda Team, "We decided to schedule this for a meeting as soon as possible because * * * I have received numerous calls now from the media asking for this." At the hearing on defendants' motion, plaintiff argued that sufficient time remained before the election date of May 15, because an ordinary, special meeting could have been called with 24-hour notice, and because May 9 offered an opportunity to consider the matter at a regular meeting.[2]

When the trial court struck this claim, it necessarily concluded both (a) that the anti-SLAPP statute applied, meaning that defendants had shown that the claim arises out of a statement in a public forum or made in the exercise of a constitutional right of speech or petition, ORS 31.150(2),[3] and then (b) that, under that statute, plaintiff had failed to show "substantial evidence to support a prima

---

[2] Plaintiff's argument paralleled advice offered by Oregon's Attorney General:

"The governing body must be able to point to some reason why the meeting could not be delayed to allow at least 24 hours' notice. An 'actual emergency' must exist, and the minutes of the meeting must describe the emergency justifying less than 24 hours' notice. ORS 192.640(3). * * *

"The Oregon Court of Appeals has indicated that it will scrutinize closely any claim of an 'actual emergency.'"

*Attorney General's Public Records and Meetings Manual* 147 (2014) (citing *Oreg. Assoc. of Classified Emp. v. Salem-Keizer*, 95 Or App 28, 32, 767 P2d 1365, *rev den*, 307 Or 719 (1989) (reversing trial court ruling finding that the circumstances presented an actual emergency)).

[3] ORS 31.150(2) describes the activities subject to the section as:

"(a) Any oral statement made, or written statement or other document submitted, in a legislative, executive or judicial proceeding or other proceeding authorized by law;

"(b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;

"(c) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with or an issue of public interest; or

"(d) Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

facie case," ORS 31.150(3).[4] Although the trial court did find that the anti-SLAPP statute applied, the trial court did not explain why plaintiff's claim, challenging simply the procedural requirements for an emergency meeting, failed to satisfy the minimal-merits test of the anti-SLAPP statute.

I concur in the majority's conclusion that defendants failed to meet their burden of showing that plaintiff's emergency-meeting claim "arose out of" any statement or conduct of the county commissioners subject to ORS 31.150(2). Contrary to the trial court's decision, plaintiff's claim arose out of perceived noncompliance with the procedure for an emergency meeting, not plaintiff's motivation for suit, the remedy for noncompliance, or the outcome of the commissioner's vote to release the attorney's letter about alleged impropriety.

A plaintiff can state a claim under ORS 192.640(3) for violation of the standards for an emergency meeting without regard to any statement or conduct that might have occurred at that meeting. That is, even if a statement or conduct subject to ORS 31.150(2) did occur at an emergency meeting, that statement or conduct would not be a material part of this alleged public meetings violation. Put another way, even if no one made a statement subject to the anti-SLAPP statute, a public meetings violation could occur if the Board of Commissioners unjustifiably met and deliberated without 24-hour notice or without the existence of and recitation of a *bona fide* emergency. *See Oregon Assoc. of Classified Emp. v. Salem-Keizer*, 95 Or App 28, 32, 767 P2d 1365, *rev den*, 307 Or 719 (1989) (reversing trial court ruling finding that the circumstances presented an actual emergency).

B.  *Inconsistent with Public Meetings Claims*

There is a larger importance to the majority's conclusion about the reach of ORS 31.150. Two California decisions

---

[4] In relevant part, the latter half of ORS 31.150(3) provides:

"If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion."

help explain why. They contain observations useful to caution government against unwarranted use of the anti-SLAPP statute to discourage citizen's efforts at government accountability. Later in Part II, I will disagree with the majority's use of a California decision on a public meetings issue, because, on a key point, Oregon's statute differs from California's statute. But, on this issue, two California comments are prescient and will serve to introduce inconsistencies between Oregon's anti-SLAPP statute and our public meetings statute.[5]

In *San Ramon Valley Fire Protection District v. Contra Costa County Employees' Retirement Assoc.*, 125 Cal App 4th 343, 22 Cal Rptr 3d 724 (2004), the court rejected an anti-SLAPP motion that had sought to avoid a writ of mandamas that would scrutinize the action of a pension board. The court explained that the board's mandatory "[a]cts of governance" are not subject to California's anti-SLAPP statute, California Code of Civil Procedure section 425.16. *Id.* at 354. The court added, "To decide otherwise would significantly burden the petition rights of those seeking mandamus review for most types of governmental action." *Id.* at 357. Anti-SLAPP motions would force government critics to make a *prima facie* showing at an early pleading stage of a case. To allow that tactic "would chill the resort to legitimate judicial oversight over potential abuses of legislative and administrative power, which is at the heart of those remedial statutes." *Id.* at 358.

Similarly, in *City of Montebello v. Vasquez*, 226 Cal App 4th 1084, 1086, 172 Cal Rptr 3d 671 (2014), the court denied an anti-SLAPP motion, where an official and city council members were accused of violating a statutory prohibition against city officers holding a financial interest in a contract with the city. That court explained:

> "To hold otherwise would cause the anti-SLAPP statute to swallow all city council actions and require anyone seeking

---

[5] Our decisions recognize that Oregon legislative history indicates that our anti-SLAPP statute was "modeled on California statutes" such that California case law may "inform Oregon courts regarding the application of ORS 31.150 to ORS 31.155." *Page v. Parsons*, 249 Or App 445, 461, 277 P3d 609 (2012); *see Young v. Davis*, 259 Or App 497, 507, 314 P3d 350 (2013).

to challenge a legislative decision on any issue to first make a prima facie showing of the merits of their claim."

*Id.* at 1093. The courts' observations have relevance to Oregon. To say the anti-SLAPP statute could "significantly burden the * * * rights" to review government action could easily be said about the effect of the anti-SLAPP statute when a citizen seeks judicial review of violations of our own Public Meetings Law. *See id.* at 1092. Two points of inconsistency are telling.

First, the anti-SLAPP statute in Oregon also forces the plaintiff to justify a claim sooner than usual, discouraging a claim. As for public meeting standards, the Oregon legislature had already added a provision at ORS 192.695 so as to require a plaintiff to present *prima facie* evidence of a public meetings violation before the public body will be required to prove that it complied.[6] That unique threshold for a public-meetings claim presumably tests plaintiff's case at trial or at least on a motion for summary judgment, *after* a citizen has had a chance to gather facts through pretrial discovery. In contrast, the anti-SLAPP statute *prevents* discovery, unless a court finds good cause to allow it. ORS 31.152(2).[7] Here, for example, the trial court denied discovery. In other words, the statutory threshold that is in the public meetings law indicates that the legislature had already provided all the necessary procedural protections that government entities need for protection from meritless claims. The test, which the anti-SLAPP statute forces upon a citizen plaintiff, seems duplicative, harsher, and, because

---

[6] ORS 192.695 provides:

"In any suit commenced under ORS 192.680 (2), the plaintiff shall be required to present prima facie evidence of a violation of ORS 192.610 to 192.690 before the governing body shall be required to prove that its acts in deliberating toward a decision complied with the law. When a plaintiff presents prima facie evidence of a violation of the open meetings law, the burden to prove that the provisions of ORS 192.610 to 192.690 were complied with shall be on the governing body."

[7] ORS 31.152(2) provides:

"All discovery in the proceeding shall be stayed upon the filing of a special motion to strike under ORS 31.150. The stay of discovery shall remain in effect until entry of the judgment. The court, on motion and for good cause shown, may order that specified discovery be conducted notwithstanding the stay imposed by this subsection."

it comes early in a case, strikes a balance between competing interests that is different than the test that the legislature chose specifically for public meetings claims.

Second and even more telling, Oregon's Public Meetings Law does not provide a routine means for the government to recover its attorney fees when prevailing. The anti-SLAPP statute, however, *requires* the court to award attorney fees, if, as here, the government prevails against the citizen. ORS 31.152(3) ("A defendant who prevails on a special motion to strike made under ORS 31.150 shall be awarded reasonable attorney fees and costs."). To apply the anti-SLAPP statute means that a citizen with the audacity to file a public meetings claim, which proves unsuccessful, "shall" be punished with the government's lawyer bill. Here, plaintiff was made liable for $7,211.50 in costs and county attorney fees, even before the suit got much past filing.

For more reasons than offered, the majority was correct in concluding that a citizen claim about the prerequisites to an emergency meeting does not involve the speech or petition activities protected by ORS 31.150. To hold otherwise would render a citizen's challenge to a questionable emergency meeting subject to scrutiny at the earliest pleading stage, suspend discovery, threaten the citizen with a debt for the county's attorney fees, and chill the citizen's right to judicial scrutiny over compliance with public meeting standards.[8] I concur that the trial court erred in

---

[8] California amended its anti-SLAPP statute to prevent its use as a device to attack citizens who bring an action in the public interest or on behalf of the general public. The introduction to the added statute explained:

"The Legislature finds and declares that there has been a disturbing abuse of Section 425.16, the California Anti-SLAPP Law, which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process or Section 425.16."

Cal Code Civ Proc § 425.17(a). A list of specified conditions is given to describe the public interest lawsuits exempted from the California anti-SLAPP statute. *Id.* § 425.17(b). This public interest exemption was not involved in either *San Ramon* or *Montebello.* Unlike California, Oregon has not yet recognized a need to similarly amend its anti-SLAPP statute.

declaring plaintiff's emergency meeting claim was subject to Oregon's anti-SLAPP statute.[9]

## II. THE PUBLIC MEETINGS STATUTE

A. *Applicable to a Quorum That Meets, Convenes, or Comes Together*

The majority concludes that the trial court also erred in dismissing plaintiff's "pre-meeting claim" that a quorum of Lane County commissioners unlawfully met to deliberate in private over a period of time on May 2 and 3 by means of a sequence of separate conversations, calls, and email communications. The majority finds error, concluding that plaintiff satisfied his burden to show substantial evidence of a *prima facie* claim of a violation of the Public Meetings Law.[10] The conclusion rests on the premise that public officials may violate ORS 192.630(2) by engaging in "a series of conversations that *involve* a quorum only when they are considered as a whole" and with hindsight. 274 Or App at 656 (emphasis added).

The majority allows, "There is no evidence in the record that a quorum of the commission actually met privately at the same time and place to discuss the Thayer letter," 274 Or App at 655, and the majority recognizes, "No

---

[9] Although the trial court did not address why plaintiff's emergency meeting claim failed to present substantial evidence of a *prima facie* case, that question is no longer appropriate at this stage of the case because ORS 31.150 does not apply to the claim. That question remains for discovery, summary judgment, or trial on the merits. It remains for the trial court to determine, for example, whether the statement of the county administrator at the outset of the emergency meeting satisfied ORS 192.640(3) in describing an actual emergency that precluded 24 hours' notice of a special meeting: *i.e.*, "We decided to schedule this for a meeting as soon as possible because *** I have received numerous calls now from the media asking for this."

[10] This court addresses the claim on the merits of the "pre-meeting claim" without deciding that the anti-SLAPP statute applies. Plaintiff disputed in the trial court whether the claim about May 2 events "arises out of" a statement or conduct subject to the anti-SLAPP statute, but conceded the issue on appeal. Because that issue as to that claim has not been briefed, this court would not examine the applicability of ORS 31.150 to the second claim. *See Young*, 259 Or App at 505 (not addressing applicability of ORS 31.150 where plaintiff did not offer any focused argument on appeal); *see also State v. Brand*, 257 Or App 647, 651, 307 P3d 525 (2013) (not the court's "function to make or develop a party's argument when that party has not endeavored to do so itself").

Oregon appellate case has addressed whether the statute applies to such 'serial' discussions." 274 Or App at 656. Nevertheless, the majority draws on statutory construction, legislative history, the distinguishable decision in *Harris v. Nordquist*, 96 Or App 19, 771 P2d 637 (1989), a California decision based on a different statute, and an understandable concern that the Public Meetings Law ought not be evaded by individual conversations. From those, the majority finds an "absence of explicit textual or historical support for the notion that the Oregon legislature intended ORS 192.630(2) to apply only where a quorum is contemporaneously present at the same place." The majority concludes, therefore, that so-called "serial meetings" violate the law.[11]

Because there *are* statutory terms, statutory context, and legislative history that point to a different conclusion, I respectfully disagree. This court should have concluded that plaintiff has failed to present substantial evidence of a *prima facie* claim that a quorum "met" in the pre-meeting conversations on or about May 2 and 3. Oregon statute does define "meeting" and related terms so as to give the same meaning to the term "to meet." There is no good reason to define differently when a quorum "meets" and when a quorum has a "meeting." There is statutory context to explain the prohibition against a private meeting in ORS 192.630(2) consistently with ORS 192.630(1) and without duplication. There is meaningful legislative history on these provisions. And there is a reason why the legislature deliberately drew a bright line with the terms involving a "quorum" that "meets." It was to avoid the uncertainty of the application of the law, which the majority opinion now creates.

---

[11] The majority's interpretation is the same adopted by a trial court in earlier litigation, *Dumdi v. Handy* in Lane County Circuit Court. The case was not reviewed on appeal. That litigation resulted in a $350,000 judgment against the county for two plaintiffs' attorney fees, as well as a stipulated judgment in which one commissioner (the plaintiff in this case) and another commissioner agreed to pay $20,000 each to the county based on allegations of willful violations of the public meetings laws. *See* ORS 192.680(3) (permitting a court order payment to a successful plaintiff where the violation was a result of intentional disregard of the law or willful misconduct by a quorum of the governing body). Plaintiff's solicitation of a contribution from a citizen to pay his debt from that case prompted the citizen to contact a lawyer who wrote the critical letter, the release of which was at issue in the county commission meeting of May 3.

It is the policy of the Public Meetings Law "that decisions of governing bodies be arrived at openly." ORS 192.620. The law mandates at ORS 192.630(1) that all "meetings" of a governing body "shall be open to the public and all persons shall be permitted to attend" except as expressly provided in limited circumstances. Central to plaintiff's "pre-meeting claim" is the prohibition against private meetings. With emphasis on critical terms, ORS 192.630(2) provides:

> "A *quorum* of a governing body may not *meet* in private for the purpose of deciding on or *deliberating toward a decision* on any matter except as otherwise provided by ORS 192.610 to 192.690."

The provision's meaning should be plain enough when its immediate terms are considered together. But, to confirm its meaning, a reader may examine each of the highlighted terms in context and with legislative history. *See State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009) (regarding use of legislative history); *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993) (rules of statutory construction).

Although the Public Meetings Law does not define a "quorum" for local governments, the Lane County Charter at least supplies the number for use with the statute.[12] Three commissioners constitute a quorum. *See* Home Rule Charter for Lane County § 10(1) ("The board of commissioners shall consist of five commissioners"), § 12 (three commissioners constitute a quorum), § 16 ("[T]he concurrence of three members *** shall be necessary to decide any question before the board.").

Although "to meet" is not directly defined in statute, it is indirectly defined in the term "meeting" and in the context of related provisions. The terms "meet" and "meeting" are two forms—verb and noun—of the same word, and, unless their usage in context indicates otherwise, they should have the same meaning. One maxim of statutory construction recognizes that use of the same term or similar terms throughout a statute indicates that the term has the same meaning throughout the statute. *PGE*, 317 Or at 611

---

[12] The dictionary, to be quoted later, provides more meaning.

(citing *Racing Com. v. Multnomah Kennel Club*, 242 Or 572, 586, 411 P2d 63 (1966)).

Because the terms are used consistently in related provisions, we can draw an understanding of "meet" from "meeting." In relevant part, the statute specifies that:

> "'Meeting' means the *convening* of a governing body of a public body for which a *quorum* is required in order to make a decision or to deliberate toward a *decision* on any matter."

ORS 192.610(5) (emphases added). As with the private-meeting prohibition in ORS 192.630(2), the definition of a "meeting" in ORS 192.610(5) repeats or alludes to the same key terms of "quorum," "meet" (here, with the synonym "convene"), and deliberating toward a "decision." The definition of a meeting speaks of the need for a "quorum," and it does so in terms of the "convening" of the group. When those provisions are read together, they reflect that to "meet" is a synonym of to "convene."

Both the private-meeting prohibition and the definition of a "meeting" speak with reference to a discussion that may eventuate in a "decision." The word "decision" contributes another quality to the words "meet" or "convene." The definition of "decision" reads:

> "'Decision' means any determination, action, vote or final disposition upon a motion, proposal, resolution, order, ordinance or measure on which a vote of a governing body is required, at any meeting at which a *quorum is present*."

ORS 192.610(1) (emphasis added). In this definition, the statute contemplates that a "decision," which is referenced in the other two provisions, involves a "quorum" that "*is present*." The several members, who are needed to constitute a quorum, must be "present" together. In order that several members may constitute a "quorum," they must collectively or simultaneously be "present"; they must "meet"; they must "convene."

Nothing in those three provisions suggests that a "quorum" of the body shall be deemed to "meet" or to have "convened" a meeting when *less* than a quorum is "present"

together. On their face, these terms do not permit the majority's interpretation that a quorum could be deemed to "meet" merely by being "involved" over a period of time through an aggregation of separate, sequential communications. *See* 274 Or App at 664. The statutes use the words "meet" and "meeting," not "involved."

Of course, the members of a public body may "meet" or hold a "meeting" by modern means without being physically present in the same place. A related statute provides that, if a meeting "is held through the use of telephone or other electronic communication," then it must be conducted according to the public meetings statutes. ORS 192.670(1). In addition, the public body must make available to the public "at least one place where, or at least one electronic means by which, the public can *listen* to the communication *at the time it occurs*." ORS 192.670(2) (emphases added). Necessarily, the provision assumes that a quorum of the body must be meeting simultaneously in order that the public can "listen" to the interchange "at the time it occurs." For that to happen, the several members must have "met" or "convened" so as to be "present" at the same time.

That reading of those statutory terms is consistent with the ordinary meaning of the words to "meet," to "convene," to be "present," and "quorum." Another maxim of statutory construction is that "words of common usage typically should be given their plain, natural, and ordinary meaning." *PGE*, 317 Or at 611. In this context, the definition of "meet" is "to join (a person) in conversation, discussion, or social or business intercourse : enter into conference, argument, or personal dealings with." *Webster's Third New Int'l Dictionary* 1404 (unabridged ed 2002). Similarly, to "convene" is "*to come together, meet, or assemble in a group or body* (as in a formal meeting for some specific purpose)." *Id.* at 497 (emphasis added). To be "present" means "being in one place and not elsewhere" or "being * * * in the same place as someone or something," as in "both men were [present] at the meeting." *Id.* at 1793. And, a "quorum" is "the number of the members of an organized body of persons (as a legislature, court, or board of directors) that *when duly assembled* is legally competent to transact business in the absence of the other members." *Id.* at 1868 (emphasis added).

Although this simultaneous assembly can be done electronically, the statutory and common terms imply that, by being present together, the quorum enjoys an opportunity for contemporaneous communication or simultaneous interaction. This opportunity is the unique feature that identifies the occasion when a group "meets," "convenes," or is "present as a 'quorum.'" The opportunity for immediate interaction distinguishes a *meeting* of a quorum, whether in person or by conference call, from mere *involvement* over time by means of a memorandum, fax, or electronic message of individuals within an unassembled group, which is not a quorum.

Legislative history underscores this understanding. Senator Fred Heard, the principal sponsor of the bill that resulted in the statute, explained at a public hearing that the intent of the word "meeting" included informal as well as formal meetings. Tape Recording, Joint Special Committee on Professional Responsibility (JSCPR Committee), SB 15, Mar 5, 1973, Tape 2, Side 1. This is evident in the functional, rather than formalistic, definition of a meeting now found at ORS 192.610(5). To "meet" as a quorum or to convene a "meeting" is a matter of what a quorum of the public body does, not whether there is a call to order or pledge to the flag. The committee's intent that the term "meeting" should concern both formal and informal meetings stops at the start of the majority's attempt to construe the definition of "meeting" (ORS 192.610(5)) or the mandate for public "meetings" (ORS 192.630(1)) as meaning something more formal.

In a subsequent work session, the committee considered replacing the word "convene" with "assemble" in the definition of a meeting, in order to avoid restricting the term and narrowing the statute with an implication of referring only to formal meetings. Minutes, JSCPR Committee, Mar 19, 1973, 3; Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2. Given the meaning of "convene," however, the concern was unfounded. The committee chair, Ingalls, consulted a dictionary and advised the committee,

"According to the small dictionary, to 'convene' means 'to summon together; *to come together in a body*; to summon before a tribunal; to cause to assemble'. Anybody like that better?"

Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2 (emphasis added). A committee member responded:

> "It's really the *getting together*, rather than who calls it and on what circumstances and whether informal or formal, but the fact that they're *getting together* for the purpose of making a decision."

*Id.* (emphases added). With those shared understandings—that the act would address both formal and informal meetings and that "convening" was meant "to come together in a body" or "getting together," the committee accepted the word "convene." Minutes, JPR Committee, Mar 19, 1973, 3.

The original draft bill lacked the private meeting prohibition that is now ORS 192.630(2). Without such an explicit prohibition against deliberation in private meetings, the promise of public meetings might have assured nothing more than ceremonial public meetings. To say that public bodies shall hold public meetings does not necessarily say they shall not hold private meetings. An express prohibition was needed to say what otherwise would have been left implied.

A spokesman from the Oregon Department of Justice proffered language to prohibit private meetings. *See id.* The initial suggestion was to add the prohibition as a second sentence at the end of the definition of a "meeting." The expanded definition would have concluded, "no governing body shall meet privately for the purpose of discussing or conducting public business." (The term "quorum" was not yet in the prohibition.) Recognizing the added sentence as more than a mere definition of a "meeting," Senator Carson[13] prompted the committee to set out the sentence as an operative provision, what eventually would become ORS 192.630(2). Minutes, JPR Committee, Mar 19, 1973, 3.

Throughout much of its discussions, the committee was concerned about the scope of its bill governing "meetings." A committee member explained that inserting the word "'a *quorum* of a' governing body" was intended to avoid

---

[13] Senator Wallace Carson was later to serve as Chief Justice of the Oregon Supreme Court.

the problem of two members who converse when they happen to go together on a ski trip or ride together to the north end of the county to look at a problem. Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2.

The committee was well aware of the narrowing effect of the term "quorum" as it appeared in several provisions. The reach of the new law was at issue. Senator Carson observed, "The difficult question becomes, do we want to limit the *coverage of the bill* to the *convening of a quorum?*" Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2 (emphases added). In the end, limiting the bill's coverage is exactly what the committee did. Contrary to the majority's reading, the committee did not create different standards by making "meeting" mean one thing and "to meet" mean another. The committee's answer to Senator Carson was to employ the same term "quorum" in critical places, such as ORS 192.610(1) and (5), and, most significantly, in the private meeting prohibition at ORS 192.630(2).[14] The result is to limit the scope of ORS 192.630(2) in terms of (1) a *quorum* of the public body that (2) *meets* (*i.e.*, "comes together as a body" [Chair Ingall's dictionary]) (3) for the purpose of deliberating toward a decision. The legislature meant exactly what it wrote and it wrote as plainly as is humanly possible.[15]

When plaintiff's "pre-meeting claim" is compared with these terms, the claim fails to show substantial evidence to support a *prima facie* claim that a (1) *quorum* (2) *met*. It is not enough to show just the possibility that (3) they deliberated toward a decision about the release of the letter. Plaintiff did offer some evidence suggesting involvement of a quorum of the commissioners. The communications

---

[14] Until today, the presence of a quorum was understood to be a prerequisite to a meeting. As the Attorney General has long observed, "A *gathering* of less than a quorum of a committee, subcommittee, advisory group or other governing body is not a 'meeting' under the Public Meetings Law." *Compare Attorney General's Public Records and Meetings Manual* 137 (2014), *with Attorney General's Public Records and Meetings Manual* 109-10 (2004) (emphasis added).

[15] If the statute seems too easily evaded—that is, if the scope of the statute seems to be too narrow when described in terms of the convening or meeting of a quorum—then the legislature should be invited to revisit its decision it made consciously when adopting the Public Meetings Law. A court should not make the amendment.

involving Stewart, Bozievich, and Leiken were communications among three of the five-member board. But the communications were sequential. Plaintiff offered only that, on the afternoon of May 2, the administrator Richardson spoke with Commissioner Stewart, then at another time with Commissioner Bozievich, before sending an email message that evening to the Agenda Team of Bozievich and Leiken. Twelve minutes later, Leiken responded by email message. Early the next morning, Bozievich responded with a separate email. After hearing from the district attorney, Richardson spoke jointly with Commissioners Bozievich and Leiken of the Agenda Team, and they decided to schedule the emergency meeting.[16]

Although the majority conflates several conversations and electronic communications into one pseudo meeting or so-called "serial meeting," we should not. We should say, using statutory or legislative terms, that plaintiff did not offer any evidence that a "quorum" of the county commission "met," "convened," "came together in a body," or were "present" as a group. We should recognize that the distinctive feature of a meeting was lacking: Never did three commissioners have an opportunity for contemporaneous communication or simultaneous interaction. Comparing plaintiff's evidence of sequential communications at distinctly different times with the terms of the Public Meetings Law, this court should have concluded that a quorum did not come together as a body in private within the meaning of ORS 192.630(2). This court should have concluded that plaintiff failed to offer substantial evidence of a *prima facie* case of a *de facto* meeting. We should have concluded that, assuming that ORS 31.150 applied, the trial court did not err in striking plaintiff's second claim.

B. *Inapplicable to Imaginary Meetings*

The majority reaches a different conclusion, endorsing plaintiff's theory of a pseudo meeting. The majority's reasons invite seven points of rebuttal. Some points, involving text and legislation, have already been introduced by

---

[16] Even if Richardson's later reference on May 9 to her call to Stewart at the time of the scheduling decision meant May 3, rather than May 2, there is no indication that Stewart participated in the May 3 call with the Agenda Team.

the preceding discussion. Some points, about California law or general concerns, will complete this rebuttal.

First, the starting point for the majority opinion is misguided. It is not proper, as a matter of statutory construction, to define "to meet" (*i.e.*, sequentially) differently than to hold a "meeting" (*i.e.*, to "convene" or be "present" together). They should have the same meaning, given that they are the same word in different forms. Where "meet" and "meeting" occur in ORS 192.610(5) and ORS 192.630(2), their surrounding terms ("quorum" and "decision") are the *same*, not different, so the surrounding terms do not demand that "meet" and "meeting" should have different meanings. *See State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011) ("[W]e ordinarily assume that the legislature uses terms in related statutes consistently.").

It is not necessary, in order to give meaning to ORS 192.630(2), to interpret "meet" and "meeting" differently. Subsection (1) and subsection (2) of ORS 192.630 do not duplicate each other. Nothing requires that "meeting" in subsection (1) should mean the convening of a quorum, while "to meet" in subsection (2) should mean the eventual *involvement* of a quorum over a period of time through a series of one-on-one conversations. There is a better and logical explanation.

Subsection (1) of ORS 192.630 emphasizes that all meetings shall be open to the public. Careful drafters could foresee that someone might think that the statute guaranteed the public access only at traditional or formal meetings. Legislative history confirms these drafters knew that to "convene" meant any gathering, formal or informal, but they had worried that someone might misconstrue to "convene" to mean only formal meetings. Indeed, that is what the majority does.[17] To avoid that uncertainty, the original bill was amended to add subsection (2) of ORS 192.630, to ban a quorum from meeting privately. The two provisions

---

[17] The majority illustrates that misunderstanding when declaring "the word 'convening' implies a formal assembly." 274 Or App at 658. The committee, however, said, about convening, that "[i]t's really the getting together rather than * * * whether informal or formal." Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2.

are two statements, one positive and one negative, serving the same goal. They are proverbial "belt and suspenders" designed to assure that the public body does not lose its pants. They assure that the regular, public meetings were not rendered ceremonial by earlier, private meetings.

The majority unnecessarily invokes the maxim about construing statutes so as to avoid reading a provision to be redundant. To apply that generalized principle here punishes the legislature for being cautious about saying, in more ways than one, that any form of contemporaneous gathering, formal or informal, shall be public. The Supreme Court has made a realistic observation that some measure of redundancy is perfectly permissible. The court stated:

> "We wish to be clear that the fact that a proposed interpretation of a statute creates some measure of redundancy is not, by itself, necessarily fatal. Redundancy in communication is a fact of life and of law. *See, e.g., Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 396-97, 737 P2d 595 (1987) (noting that legal terminology often is redundant, 'sometimes for clarity, sometimes for emphasis'). In some cases, it may be what the legislature intended. *See, e.g., Thomas Creek Lumber and Log Co. v. Dept. of Rev.*, 344 Or 131, 138, 178 P3d 217 (2008) ('[N]othing prohibits the legislature from saying the same thing twice * * *.')."

*Cloutier*, 351 Or at 97-98. With this statute, any purported redundancy, as between an *implied* prohibition and an *express* prohibition, was intended. Any imagined redundancy, as between a positive admonition and a negative prohibition, was done for clarity and emphasis.

Second, to aggregate multiple conversations into a collective involvement of a quorum over an indefinite period of time essentially *deletes* from statutory text the word "meet" in relation to a quorum. With the majority's construction, there is in the statute no "getting together" (*i.e.*, the synonym used in legislative history), nor "convening" (*i.e.*, legislative choice of words), despite the word "meet" and its neighbor "meeting." In the place of the statute's word "meet," the majority substitutes the word "involve." It now suffices that a quorum is "involved" eventually over a period of time. We are reminded:

"In the construction of a statute, *the office of the judge is* simply to ascertain and declare what is, in terms or in substance, contained therein, *not* to insert what has been omitted, *or to omit what has been inserted*; and where there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."

ORS 174.010 (emphases added). Nevertheless, omitting what has been written, and inserting what is not written, is the result of the majority's decision.

Third, legislative history shows that the drafters were aware that they were drawing a bright line that required the presence of a quorum and that would thereby limit the scope of the law. No doubt the drafters knew that bright line would likely leave the risk of abuse that the majority reasonably fears.

To be fair, nothing in the record indicates that the committee anticipated the novel notion that separate conversations between individuals over time might somehow amount to the *involvement* (not a "meeting") of a "quorum." On that particular absence of record, the majority and dissent agree. But the committee did worry aloud about the prospect that any two members might comprise a "meeting" when talking business on a personal ski trip or on a trip to the north end of the county to see problem. As a consequence, the committee inserted the word "a *quorum* of a 'governing body'" in order to avoid the problem when any two members of the public body get together and talk about the public's business.

The committee recognized the limiting effect of its action. The record bears repetition. Senator Carson asked, "The difficult question becomes, do we want to limit the *coverage of the bill* to the *convening of a quorum*?" Tape Recording, JSCPR Committee, SB 15, Mar 19, 1973, Tape 3, Side 2. (Emphases added.) The answer was, "yes." The necessity that a "quorum" would "meet" was inserted in both provisions of ORS 192.630(2) and other provisions of the enactment. The legislature consciously chose *not* to treat the conversation of any members, who are less than a quorum, as subject to the law. Therefore, the legislature would not have dreamed of conflating the individual, separate, one-on-one

conversations into one aggregated pseudo-meeting or, what the majority dubs, a "serial meeting."

Fourth, there is no precedent for the majority's unusual construction of this statute. Although the majority finds helpful the "analytical approach" in *Harris v. Nordquist*, 96 Or App 19, 771 P2d 637 (1989), the decision is readily distinguishable. The issue was whether informal gatherings of a school board at a restaurant violated the public meetings law. *Id.* at 21. The case began with the factual premise that a quorum of the board was present together. The only issue was whether any deliberations toward a decision had occurred. *Id.* at 24. No one has ever doubted that an informal gathering *could* violate the Public Meetings Law *if* deliberations toward decision occurred. The court simply found that no deliberations had occurred. *Id.* at 25. Absent deliberations, there was no meeting, and minutes or other formalities of a meeting were unnecessary. To perceive more significance to the case than the facts presented is unwarranted. The case does not support the majority's conclusion that *sequential* conversations between isolated individuals over time would violate the law. The majority admits that the case does not go that far, and the majority is candid to recognize that no Oregon case provides precedent for the majority's decision.

Fifth, to borrow from California on this issue is to borrow confusion. It is true that the drafters of Oregon's statute saw California's version of a public meetings law. Tape Recording, JSCPR Committee, SB 15, Tape 2, Side 1 (statement of Fred Heard); *see* 1 Cal Gov't Code § 54953 (1973) (Brown Act). But it is also true that Senator Heard, the principal sponsor of the Oregon enactment, observed that the California counterpart lacked a definition of a "meeting." Tape Recording, JSCPR Committee, SB 15, Tape 2, Side 1. That uncertainty left this term, which is at the heart of the statute, for the courts to define. *Id.* As a consequence, the drafters of Oregon's bill did what California did not do. Our legislators labored to define "meeting" and to insert "quorum" in both the proscription against private meetings and the definition of "meeting." ORS 192.610(5); 192.630(2). In so doing, Oregon's drafters made a deliberate choice that distinguished Oregon's statute from California's ambiguity.

The majority's California reference, the decision of *Stockton Newspapers, Inc. v. Members of the Redevelopment Agency,* 171 Cal App 3d 95, 214 Cal Rptr 561 (1985), was not decided until 12 years after Oregon's enactment. Consequently, the California decision was not before Oregon's drafters as a matter of legislative understanding about the California statute. The decision cannot suggest our legislative intent. Given Oregon's deliberate choice to define "meeting" and to insert the requirement that a "quorum" must "meet," the *Stockton Newspaper* decision would seem alien to Oregon's drafters. Given Oregon's statutory difference, the decision cannot suggest how this court should construe our terms "meet," "meeting," or "quorum."

Sixth, the majority decision is based on something other than text and context, legislative history, Oregon precedent, or California guidance. It is based on concern. The majority worries, "The legislative objective could be easily defeated if the statute rigidly applied only to contemporaneous gatherings of a quorum." 274 Or App at 662. That is a legitimate concern about evasion of the purpose of the public meetings law. However, to indulge that concern in the absence of textual support is to engage in judicial law-making. Because this field of law is not common law, judicial law-making, without textual support, is inappropriate.

Reflecting its worries, the majority imagines other situations, which are not presented in these facts, in which members of a public body might be polled about an issue by an intermediary, presumably separately and at different times. Or, in email messages to the group, board members might express themselves on upcoming issues. Or, a series of rapid, serial text messages could pass between members before an official meeting. The majority would treat all such situations alike—all as violations of the law. 274 Or App at 662.

If anything, these imagined situations serve to suggest the wide variety of situations that will challenge the majority's new interpretation of the law. The first situation resembles the conduct of a legislator's assistant "counting heads" or "testing the water" about a proposal in various, separate conversations with legislators. The second

situation resembles email communications among school board members just doing their jobs by expressing their ideas or constituents' concerns. The third situation may offend our sensibilities when done to reach a decision privately. In the end, however, to the extent that unscrupulous officials could deliberate toward decision *in seriatim* so as to skirt the bright line set by the "meeting" of a "quorum," then the right remedy is the remedy of the democratic process: public disclosure, aided by the press, and followed by an election challenge resolved at the ballot box.

Finally, the majority does not offer a workable substitute for the law that is already written and clear. The majority contends that a violation would not occur when two officials speak privately on a matter of public concern or upcoming vote. 274 Or App at 666. How this is so is not self-evident, when that single conversation can now be aggregated with other conversations over time, so as to comprise a "serial meeting." Yet, the majority declares that, to be a violation, serial communications must be "for the 'purpose' of deliberation or decision" and may occur with "some evidence of coordination, orchestration or other indicia of a 'purpose' by a quorum to deliberate or decide out of the public eye." 274 Or App at 666. The trouble with those features of a violation are self-evident. It is true that the statute speaks of meeting for the purpose of deliberating toward an eventual decision. But the term "deliberate" is not defined in statute and has broad meaning. The majority recognizes that "to deliberate" means "to ponder or think about with measured careful consideration." 274 Or App at 657 n 10. Nearly any discussion between two officials about an issue would be "pondering" or "thinking about" the issue, even if only to evaluate an idea or hear another's opinion.

Further, there is no statutory basis to justify inserting an "orchestration" element into the elements of a violation. A public meetings law violation does not permit, require, or need proof of an offender's state of mind, intent, or *mens rea*. It is a strict liability violation. Intent or willfulness becomes a factor in a court's assessment whether to void the vote of a governing body or whether to hold individual violators personally liable, ORS 192.680(3), (4), but

intent or willfulness is not a factor in assuming whether a quorum has "met" or a violation has occurred.

Needless to say, it will be virtually impossible to evaluate whether a "serial meeting" has occurred with "some evidence of coordination, orchestration or other indicia of a 'purpose[.]'" 274 Or App at 666. The majority reinstates the "premeeting claim," although the facts at hand do not suggest any particular "coordination" or "orchestration," or "purpose" other than the everyday happenstance of a series of conversations, phone calls, or emails. If anything, the only inference of "orchestration" might arise from an assumption from past circumstances that the three commissioners involved had become allied against the other two commissioners. If these facts pose a claim, then anything will.

To try to put the majority's rule into simple words reveals the problem. If a public meetings case could be tried to a jury, it would be hard to imagine how anyone could write an instruction in plain terms to tell a jury when a series of separate conversations should be aggregated after the fact, in hindsight, so as to conclude that a quorum has met and the law has been violated. It is just as hard to imagine how the attorneys who advise Oregon's governing bodies could tell their members when they may talk business outside meetings and when they will be deemed to violate the law. What is innocent information-gathering and what is deliberating or pondering an issue? How little time passes between communications so as to permit them to be aggregated into a pseudo meeting? How much time must pass before a second colleague can safely talk to a third? Does "orchestration" occur when one official contacts all the others in sequence? Does "orchestration" occur when each official talks business to another in a round-robin sequence? Does it matter if the first member intended that all members be involved? Because a violation occurs without regard to anyone's knowledge or intent, does a violation occur if it just happened that a quorum became involved eventually?

The trouble in defining the scope of the statute, as does the majority, is finding its limit and learning to live by that limit. If the majority's imagined situations really were all violations, then many innocent situations will become

violations. One board member may telephone a second member, who later telephones a third member the next day or even the next week, thereby collectively "involving" a quorum over time and unwittingly making the members violators of the law. Or, a violation would seem to occur when a board member mails a memo to colleagues in preparation for a normal meeting, expressing a position, comment, or an idea. All would read and consider it; thus, in the majority's formulation, all deliberate and, as a quorum, all are "involved." Or, because board packets are routinely circulated to board members in advance of formal meetings, any sequential conversations among members to prepare for the upcoming meeting spell danger. The majority's formulation knows no boundary.

The members of Oregon's governing bodies will not know when they violate the law. Without the clear standard that the legislature already set—the meeting or convening of a quorum—today's decision means courts will decide the meaning of a "meeting" in hindsight case by case. In application, today's decision creates a "gotcha" standard that cannot be known until too late, when a court rules, giving a hapless official the bad news.

What public officials will know, after the decision in this case, is that no single member of a public body will dare talk any business with another member in the hallway, on the telephone, by email, or anywhere other than at a public meeting. No single member of a public body should dare read a group memo and respond with better ideas, criticisms, or agreement. Otherwise, with unpredictable hindsight, a court can now conflate all the unwitting discussions together into one so-called "sequential meeting."

### III.   CONCLUSION

The majority concludes that the Public Meetings Law is violated by "'deliberation' among * * * a quorum even if the quorum is not all together at the same time and place[.]" 274 Or App at 661. The resulting world of ambiguity—this Twilight Zone—is what the legislature worried about and intended to avoid. I suspect an elastic view of when a quorum "meets" does more harm than good, because the vast majority of volunteers on governing bodies do not conspire

to evade the law. If there will be a few scoundrels who now will be found to be violators, there will be many dozens more innocent officials made vulnerable to unwarranted lawsuits to be decided with a vague "gotcha" standard. Worse, the everyday work of public officials will be hampered by fear of an unwitting violation. Today's decision on "serial meetings" will trouble all governing bodies greatly. As to that part of the decision, I respectfully dissent.