No. 73 November 25, 2016 605

# IN THE SUPREME COURT OF THE STATE OF OREGON

Rob HANDY,
*Respondent on Review,*

*v.*

LANE COUNTY,
Jay Bozievich, Sid Leiken
and Faye Stewart,
*Petitioners on Review.*

(CC 161213685; CA A153507; SC S063725)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 14, 2016.

Stephen E. Dingle, Office of Lane County Counsel, Eugene, argued the cause and filed the briefs for petitioners on review.

Marianne Dugan, Eugene, argued the cause and filed the brief for respondent on review. Also on the brief was Daniel Galpern, Eugene.

Harry Auerbach, Portland Office of City Attorney, argued the cause for *amici curiae* Association of Oregon Counties, League of Oregon Cities, City of Portland, and Washington County. Sean O'Day, League of Oregon Cities, Salem, filed the brief. Also on the brief were Rob Bovett, Association of Oregon Counties, Katherine Thomas, Office of Multnomah County Attorney, Harry Auerbach, Portland Office of City Attorney, and Alan A. Rappleyea, Washington County Counsel.

Keith M. Garza, Law Office of Keith M. Garza, Oak Grove, filed the brief for *amicus curiae* Tri-County Metropolitan Transit District of Oregon. Also on the brief was Erik Van Hagen, TriMet.

_____
* On appeal from Lane County Circuit Court, Richard L. Barron, Judge. 274 Or App 644, 362 P3d 867 (2015).

Alan A. Rappleyea, Washington County Counsel, Hillsboro, filed the brief for *amicus curiae* Washington County.

Jack L. Orchard, Ball Janik, LLP, Portland, filed the brief for *amici curiae* Oregon Newspaper Publishers Association, Albany Democrat-Herald, Beaverton Valley-Times, Canby Herald, Central Oregonian, Corvallis Gazette-Times, Eugene Register-Guard, Forest Grove News-Times, Gresham Outlook, Hood River News, Lake Oswego Review, Lebanon Express, Madras Pioneer, McMinnville News-Register, The Oregonian, Polk County Itemizer-Observer, Portland Tribune, The Dalles Chronicle, Tigard and Tualatin Times, Wilsonville Spokesman, and Woodburn Independent. Also on the brief was Amy Heverly.

KISTLER, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The case is remanded to the Court of Appeals for further consideration consistent with this decision.

**KISTLER, J.**

Oregon's public meetings law provides that a quorum of a public entity's governing body "may not meet in private for the purpose of deciding on or deliberating toward a decision." ORS 192.630(2). Plaintiff filed this action claiming, among other things, that a quorum of the Lane County commissioners had violated that provision by engaging in a series of private communications to decide whether to comply with a public records request. Plaintiff's claim raises primarily two issues. The first is whether a quorum of a public body can "meet" in violation of ORS 192.630(2) by means of seriatim communications or whether a quorum can meet only if all the members of the quorum are present at the same time. The second issue is whether, if a quorum can meet by means of seriatim communications, plaintiff's evidence was sufficient to establish that a quorum of the commissioners met privately.

The trial court assumed that a quorum can meet by means of seriatim communications, but it ruled that plaintiff had not offered sufficient evidence to avoid defendants' special motion to strike. *See* ORS 31.150 (providing for special motions to strike certain kinds of claims). The court accordingly dismissed plaintiff's claims without prejudice. The Court of Appeals reversed. *Handy v. Lane County*, 274 Or App 644, 362 P3d 867 (2015) (en banc). The majority held that a quorum can meet by means of seriatim communications and that plaintiff had presented sufficient evidence from which a reasonable trier of fact could find that a quorum of the Lane County commissioners had met to decide or deliberate toward deciding whether to comply with a public records request. *Id*. The dissent would have held that a quorum can meet only if all the members of the quorum are present at the same time, either in person or electronically, which had not occurred in this case. *Id*. at 684 (DeVore, J., dissenting).

We allowed defendants' petition for review to consider those issues. We now hold that, even if plaintiff can rely on a series of communications to establish that a quorum met to decide or deliberate toward a decision, the evidence in this case was not sufficient to establish that a

quorum had done so. That is, we agree with the trial court that, given the evidence that plaintiff offered in response to defendants' special motion to strike, no reasonable trier of fact could find that a quorum met to decide whether to comply with the public records request. We reverse the Court of Appeals decision in part and affirm it in part.

## I.   FACTS AND PROCEEDINGS BELOW

In April 2011, the Lane County Circuit Court entered a $350,000 judgment against the Lane County Board of Commissioners for violating the public meetings law. *Dumdi v. Handy*, Lane County CC No. 16-10-02760 (2011) (general judgment).[1] Additionally, as a result of those public meetings law violations, the trial court entered $20,000 judgments individually against the plaintiff in this case (who was a defendant in *Dumdi*) and another Lane County Commissioner (Sorenson). *Id.*

A year later, plaintiff was running for reelection as a Lane County Commissioner. On May 1, 2012, the Lane County District Attorney received a call from a local businessman, who said that plaintiff "ha[d] been pushing him to donate money 'anonymously' to pay off a debt" that plaintiff owed Lane County. According to the caller, other persons may have already made anonymous donations on plaintiff's behalf to help pay off the debt. Given plaintiff's status as a county commissioner, the district attorney concluded that it was inappropriate for his office to investigate that allegation. He accordingly asked the Oregon Department of Justice to investigate.

The next day, on May 2, an attorney representing the businessman sent a letter to plaintiff, stating that plaintiff had asked the businessman to make an anonymous "campaign contribution or a $3,000 payment to Lane County for [plaintiff's] personal benefit." The letter explained why, in the attorney's view, plaintiff's request had violated Oregon's ethics laws, campaign finance laws, and criminal laws. The attorney also observed that, in his

---

[1] Because the question on review is whether plaintiff's evidence was sufficient to establish a prima facie case, *see* ORS 31.150(3), we state the facts in the light most favorable to plaintiff.

opinion, plaintiff's actions exposed Lane County to liability. Enclosed with the letter were several documents. One was a copy of a handwritten note that purported to be from plaintiff to the businessman, asking him to make an anonymous $3,000 contribution to help pay off the $20,000 debt that plaintiff owed Lane County. Also enclosed was a list of payments that previously had been made on plaintiff's $20,000 debt to Lane County. In addition to showing biweekly payroll deductions, the list showed three contributions totaling $3,020 from unnamed citizens. The attorney copied the letter on the Lane County District Attorney, the Secretary of State, the Elections Director, and the Oregon Government Ethics Commission. The attorney also attached a copy of the letter to an email, which he sent at 2:28 p.m. on May 2 to the Lane County District Attorney.

Within two hours after the attorney emailed the letter, the Lane County administrator received a public records request from Bill Lunden at a local radio station. Having received that request, the county administrator asked the district attorney about it. The district attorney responded by email at 4:04 p.m., "I assume this is the record Mr. Lunden is seeking. Holy cow . . . this just arrived in my office at 14:38 [*sic*]. I haven't even read the attached letter yet!" (Ellipses in original.) The county administrator wrote back eight minutes later and said, "After you read it let me know what you want me to do."

Between 4:04 p.m. and 7:30 p.m., the county administrator spoke to two county commissioners (Commissioners Bozievich and Stewart). Both asked her about potential county liability. At 7:38 p.m., the county administrator sent the following email to two county commissioners (Commissioners Leiken and Bozievich), which she copied on the district attorney and a senior county counsel:

> "Commissioners, I've now had a chance to review the letter we received today from [the businessman's attorney]. Commissioner Stewart asked me about County liability. Commissioner Bozievich had the same concern when I spoke to him earlier. I would like to consult with [the district attorney] and/or [the senior county counsel], but at

the very least it makes me concerned about what else may be occurring that we aren't aware of. I'd like to give some advice to Finance as to what they should do with the monies we've already received. I'm also concerned that it will look like we are trying to hide something if we refuse the public records request. Our practice is to use the exceptions if they exist, but it feels wrong in this case. I'll consult with counsel on all of these issues and get back to you tomorrow."

Twelve minutes later, Commissioner Leiken replied to the county administrator with a copy to Commissioner Bozievich. Leiken's email stated, "I just read the letter from [the businessman's attorney] and I am very concerned as well with regards to the county's potential liability. I will be in tomorrow morning and look forward to what you find out."

The next morning, May 3, at 5:56 a.m., Commissioner Bozievich replied to the county administrator and Commissioner Leiken. His email said:

"I will be available to come in the morning also. Looking forward to a quick decision on disclosure. Seems like the actual letter to [plaintiff] putting him on notice is already putting any investigation at risk and I do not want to be seen as covering up the receipt of funds from a possible illegitimate source."

A minute later, Commissioner Bozievich sent a second email to the county administrator, saying that Lunden, the person who had made the public records request, was texting him about getting a copy of the attorney's letter. Bozievich asked the county administrator whether there was "[a]ny news on this yet?"

Approximately an hour later, at 7:09 a.m., the county administrator replied to Bozievich by email, "No. Just got done checking emails and texts. Will call [the district attorney]." The district attorney concluded that the attorney's letter came within an exception to the public records law and decided that he would invoke the exception and not release it. Having made that decision, the district attorney advised the county administrator (at some point after 7:09 a.m.) that the commissioners could choose to release the letter even though the district attorney had made a different

decision.[2] As Commissioner Bozievich later explained, "we were waiting for [the district attorney's] advice as of 7:09 am. It was after [the county administrator] called [the district attorney] that [the county administrator] contacted the agenda committee, Chair and vice-Chair [of the County Commissioners], and it was decided to hold a meeting ASAP based on [the district attorney's] response."[3]

The County Commissioners held a public emergency meeting at 9:00 a.m., less than two hours after the district attorney notified the county administrator that, although he had decided to invoke the public records exception, the county commissioners could choose to release the letter. Commissioners Bozievich, Leiken, and Stewart attended the emergency meeting. Plaintiff and Commissioner Sorenson did not attend. The meeting lasted 16 minutes, during which each of the commissioners present explained why he voted to release the letter. After the meeting ended, the county administrator sent the attorney's letter to the members of the media who had requested it.

Plaintiff brought this action against Lane County and Commissioners Stewart, Leiken, and Bozievich (defendants). Plaintiff's complaint alleged three claims for relief. The first claim alleged that defendants had violated the public meetings law by failing to give either sufficient notice of the May 3 meeting or a sufficient explanation for holding an emergency meeting and by not issuing minutes for that

---

[2] The district attorney emailed Lunden at 8:48 a.m. on May 3, explaining that "[m]ost or all of th[e] record [that Lunden was seeking] is protected from public records disclosure because it provides detail and evidence relating to a potential criminal investigation." After advising Lunden that he had turned the matter over to the Oregon Department of Justice, the district attorney explained that he had decided to invoke the criminal investigation exception to the public records law and would not himself release the letter. He noted, however, that the County Commissioners could choose to release the letter even though he had invoked the exception. Finally, he noted that Lunden could contact the Department of Justice, which might take a different position and also release the letter.

[3] Six days later, on May 9, the county administrator emailed the Lane County Counsel's office saying, "Here's the communications about calling an emergency session and the reason why. I called Commissioner Stewart to get his input, and then we scheduled it." Attached as an email string were the county administrator's May 2 email to Bozievich and Leiken and their replies to her, all of which are set out above. It appears from her email that Commissioners Bozievich and Leiken were the two members of the agenda committee responsible for calling an emergency meeting of the County Commissioners.

meeting. The second claim for relief alleged that the communications among the three commissioners that preceded the emergency meeting violated ORS 192.630(2) because a quorum of the commissioners had met privately to decide or deliberate toward deciding (1) whether to meet on an emergency basis and (2) whether to release the attorney's letter. The third claim for relief sought injunctive relief because of defendants' repeated violations of the public meetings law. The third claim for relief did not identify any violation of the public meetings law other than the violations alleged in the first two claims for relief.

Defendants responded by filing a special motion to strike plaintiff's complaint pursuant to Oregon's anti-SLAPP statute. *See* ORS 31.150 (providing for special motions to strike certain claims).[4] Under the anti-SLAPP statute, if a defendant establishes a prima facie case that a claim arises out of protected statements, documents, or conduct, the burden shifts to the plaintiff "to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3). If the plaintiff does not present sufficient evidence to meet that burden, then the anti-SLAPP statute directs the trial court to dismiss the claim without prejudice. ORS 31.150(1).

After considering the evidence set out above, the trial court granted defendants' motion to strike all plaintiff's claims for relief. The court reasoned that the gravamen of the first two claims was defendants' decision to release the attorney's letter. The court concluded that those claims for relief arose out of the statements that the commissioners allegedly had made and thus triggered the protections of the anti-SLAPP statute. As noted, under that statute, the burden shifted to plaintiff "to establish that there is a probability that [he] will prevail on the claim by presenting substantial evidence to support a prima facie case." ORS 31.150(3).

---

[4] SLAPP is an acronym for strategic lawsuits against public participation. *See Neumann v. Liles*, 358 Or 706, 722-23, 369 P3d 1117 (2016). Anti-SLAPP statutes seek to minimize the effect of strategic suits intended to deter persons from expressing their views. *Id.* Their goal is to permit defendants who are targeted for their statements to end such suits quickly and with minimal expense. *Id.*

In seeking to meet that burden, plaintiff relied on the Lane County Circuit Court decision in *Dumdi*, which had held that a quorum of a governing body can "meet" in violation of ORS 192.630(2) by means of a series of communications made for the purpose of deciding or deliberating toward deciding an issue. In resolving defendants' motion to strike, the trial court assumed that *Dumdi* correctly stated the law. It ruled, however, that even under *Dumdi*, "plaintiff has not shown he is likely to prevail." That is, the trial court found that plaintiff's evidence was insufficient as a matter of law to meet the legal standard that *Dumdi* announced.[5] The court dismissed plaintiff's first two claims for relief on that ground, and it dismissed plaintiff's third claim for relief because it depended on the first two.

A divided Court of Appeals reversed the trial court's judgment and remanded the case for further proceedings. *Handy*, 274 Or App at 669. The majority reasoned that plaintiff's first claim for relief was not subject to the anti-SLAPP statute. *Id.* at 668-69. That claim alleged that defendants had violated the public meetings law by failing to give either sufficient notice of the May 3 meeting or a sufficient explanation for holding an emergency meeting and by not issuing minutes for that meeting. The court reasoned that, because that claim did not arise out of any protected conduct listed in the anti-SLAPP statute, that statute did not provide a basis for striking plaintiff's first claim. *Id*.

Regarding plaintiff's second claim for relief, the majority explained that that claim for relief challenged two related but separate decisions that a quorum of the commissioners allegedly had made: the decision to call an emergency meeting and the decision to release the attorney's letter. The majority held that the public meetings law did not apply to the first decision. *Id.* at 654. On that issue, the majority reasoned that the public meetings law applies only to decisions that require a vote of a quorum of the governing body. *Id.*; *see* ORS 192.610(1) (defining "decision" as

---

[5] The trial court also denied plaintiff's request to allow it to engage in further discovery beyond the documents that plaintiff had received as a result of a public records request. In its written order, the court stated that, "because it does not believe it is likely plaintiff would prevail on his claims for relief, there is no reason to allow further discovery."

"any determination, action, vote or final disposition upon a motion, proposal, resolution, order, ordinance or measure on which a vote of a governing body is required, at any meeting at which a quorum is present"). However, under the Lane County charter, the decision to hold an emergency meeting does not require a vote of a quorum of the county commissioners. *Handy*, 274 Or App at 654. It followed, the majority reasoned, that even if a quorum of the Lane County commissioners had met privately to decide whether to hold an emergency meeting, doing so would not violate the public meetings law. *Id.* The Court of Appeals accordingly upheld, on a different ground, the trial court's judgment regarding the first decision that gave rise to plaintiff's second claim for relief.

The majority reached a different conclusion regarding the other decision that plaintiff's second claim for relief challenged—the decision to release the attorney's letter. Regarding that decision, the majority held that a quorum of a governing body can "meet" seriatim if each member of a quorum communicates with the other members of the quorum for the purpose of reaching a decision or deliberating toward a decision. *Id.* at 664-66. The majority also concluded that plaintiff's evidence was sufficient to state a prima facie case that each of the three commissioners had communicated privately with the other two commissioners for the purpose of deciding whether to release the attorney's letter. *Id.* at 667. The majority accordingly reversed the trial court's judgment dismissing that part of plaintiff's second claim for relief. *Id.*[6]

The dissent would have held that the term "meet" in ORS 192.630(2) should be interpreted the same way as the defined term "meeting." *See id.* at 678-79 (DeVore, J., dissenting); ORS 192.610(5) (defining "meeting"). In the

---

[6] Although the majority did not address the trial court's disposition of plaintiff's third claim for relief, it reversed the trial court's judgment in its entirety. The trial court had dismissed the third claim for injunctive relief because it depended on the first two claims stating actionable violations of the public meetings law. Having concluded that plaintiff's first two claims for relief, in whole or in part, stated actionable violations of the public meetings law, the majority presumably concluded that the third claim for relief also had to go back to the trial court.

dissent's view, a quorum of a public body will meet only if there is a contemporaneous gathering of a quorum, either in person or electronically. It followed, the dissent reasoned, that a quorum cannot meet by means of a series of a communications, even if all those communications were exchanged for the purpose of reaching or deliberating toward a decision. Because there was no evidence of a contemporaneous gathering, the dissent would have affirmed the trial court's judgment on that ground.

## II. ISSUES ON REVIEW

On review, the parties' arguments are limited. Defendants do not challenge the Court of Appeals' conclusion that plaintiff's first claim for relief is not subject to a motion to strike under the anti-SLAPP statute. Rather, defendants' argument is focused on the Court of Appeals' resolution of the second part of plaintiff's second claim for relief—that the commissioners' seriatim communications established that they decided or deliberated toward a decision to release the attorney's letter. On that issue, defendants adopt, in large part, the dissent's position that the public meetings law does not apply to seriatim communications among a quorum of the commissioners. They also point out the absence of any evidence that the county administrator was acting as an agent for Commissioner Stewart, and they question how the absence of any evidence that three commissioners decided or deliberated toward a decision whether to release the letter can be converted into a reasonable inference that they did.[7]

Plaintiff, for his part, does not challenge the Court of Appeals' decision dismissing the first part of his second claim for relief; that is, he does not challenge the Court of Appeals' conclusion that, under the Lane County charter, the decision whether to call an emergency meeting is not a "decision" to which the public meetings law applies. He

---

[7] Defendants' evidentiary discussion on review is directed to showing that three commissioners (or two commissioners and an agent for a third) did not meet under the dissent's interpretation of ORS 192.630(2)—namely, that they did not communicate simultaneously regarding whether to release the attorney's letter. However, if defendant's evidentiary point is correct, it also establishes that a quorum did not meet under plaintiff's interpretation of ORS 192.630(2).

also does not dispute that the anti-SLAPP statute applies to the second part of his second claim for relief.[8] His argument focuses on one issue. Adopting the majority's reasoning in the Court of Appeals, plaintiff argues that the second part of his second claim for relief can go forward because the seriatim communications that preceded the emergency meeting established a prima facie case that a quorum of the commissioners met to decide or deliberate toward a decision to release the attorney's letter.

The question that the parties raise on review entails three issues. The first arises under the anti-SLAPP statute: What standard must a plaintiff's evidence meet once the defendant shows that the plaintiff's claim arises out of a statement to which the anti-SLAPP statute applies? The second issue arises under the public meetings law: Can a quorum of a public body "meet" by means of seriatim communications or must all the members of the quorum be present at the same time? The third issue is case specific: Was the evidence that plaintiff offered to support the second part of his second claim for relief sufficient to defeat a motion to strike under the anti-SLAPP statute?

The parties' briefs on review focus on the second issue noted above. At oral argument, however, the parties were asked whether plaintiff's evidence was sufficient, even under the legal standard that the Court of Appeals announced and that plaintiff urges us to adopt. We conclude that it is appropriate to begin with that issue. If plaintiff's evidence is not sufficient to permit a reasonable trier of fact to infer that defendants "met" in violation of ORS 192.630(2), even under the Court of Appeals' interpretation of that statute, then any decision as to what that statute means could be viewed as unnecessary and perhaps *dicta*. Beyond that, we think it fair to say that the correct interpretation of the term "meet" in ORS 192.630(2) is far from clear. Both the majority and the dissenting opinions in the Court of Appeals offered persuasive and diametrically opposed interpretations of that term after invoking competing rules of statutory interpretation and seeking to glean the legislature's

---

[8] The Court of Appeals noted that plaintiff had conceded that issue. *Handy*, 274 Or App at 652-53.

intent from scraps of legislative history and different views of the purpose of the public meetings law.

Admittedly, courts are charged with determining what a statute means even when the sources for making that determination can only be described as opaque. But we think the more prudent course in this case is to determine initially whether we need to undertake that task. That is, the better course in this case is to ask whether plaintiff's evidence was sufficient to avoid defendant's special motion to strike, even under the interpretation of ORS 192.630(2) that plaintiff urges us to adopt. If it was, only then would we need to determine the statutory question that divided the Court of Appeals—whether a quorum can "meet" by means of seriatim communications. In considering the sufficiency of plaintiff's evidence, we first clarify the standard of review under ORS 31.150. We then turn to the evidence that plaintiff offered in response to defendants' motion.

## A.   *Standard of review*

We begin with the burden that the anti-SLAPP statute places on a plaintiff once a defendant makes a prima facie showing that the plaintiff's claim arose out of protected statements, documents, or conduct under ORS 31.150(2). On that issue, ORS 31.150(3) provides that, if a defendant

> "mak[es] a prima facie showing that the claim against which the motion [to strike] is made arises out of a statement, document or conduct described in [ORS 31.150(2)], *** the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case."

This court has not addressed what the requirement that a plaintiff show a "probability" of prevailing "by presenting substantial evidence to support a prima facie case" means, and we look to the text, context, and legislative history of ORS 31.150(3) to resolve that issue.

### 1.   *Text*

Textually, the description of the plaintiff's burden divides into two parts. The first part states that a plaintiff must "establish that there is a probability that the plaintiff

will prevail on the claim." ORS 31.150(3). The second part specifies how a probability may be established—"by presenting substantial evidence to support a prima facie case." *Id*. We note, as an initial matter, that the two parts of that description do not fit neatly together. In this context, presenting a prima facie case means that the plaintiff has presented enough evidence to avoid a directed verdict—namely, enough evidence to meet the plaintiff's burden of production. *See State v. Rainey*, 298 Or 459, 463, 693 P2d 635 (1985) (defining "prima facie case").[9] Ordinarily, presenting enough evidence to avoid a directed verdict does not necessarily equate with establishing a "probability" of prevailing, or at least there is some tension between those two concepts.

We also note that ORS 31.150(3) requires a plaintiff to present "substantial evidence" to support a prima facie case. It is unclear whether the phrase "substantial evidence" requires more evidence (or more persuasive evidence) than ordinarily would be required to establish a prima facie case. Put differently, when used in conjunction with requiring a plaintiff to establish a "probability" of prevailing, the phrase "substantial evidence" could suggest an intent to require something more than the ordinary showing necessary to meet a party's burden of production. The text of the statute does not provide a clear answer.

2. *Context*

The context does not shed much light on the issue. There is no dispute that Oregon modeled its anti-SLAPP statute on California's. However, the section of Oregon's anti-SLAPP statute that gives rise to this issue is unique to Oregon; California's anti-SLAPP statute contains no comparable section. *Compare* ORS 31.150(3), *with* Cal Code Civ Proc § 425.16 (West 2001).[10] Because the relevant text

---

[9]   The court observed in *Rainey* that the phrase "prima facie" can be used in two senses. A prima facie case "'may mean evidence that is simply sufficient to get to the jury, or it may mean evidence that is sufficient to shift the burden of proof.'" 298 Or at 463 (quoting *Lampos v. Bazar, Inc.*, 270 Or 256, 279, 527 P2d 376 (1974)). The context reveals that the legislature used the phrase in the first sense.

[10]   When Oregon adopted its anti-SLAPP statute, California's anti-SLAPP statute provided (and still provides) that, if that statute applies, a plaintiff must "establis[h] that there is a probability that the plaintiff will prevail." Cal Code

of Oregon's statute is not found in California's statute, we cannot presume, as we ordinarily would, that California Supreme Court decisions that preceded the adoption of our statute and that addressed the showing a plaintiff must make in response to a motion to strike provide context for interpreting ORS 31.150(3). *Cf. State v. Stockfleth/Lassen*, 311 Or 40, 50, 804 P2d 471 (1991) (explaining that, "when Oregon adopts the statute of another jurisdiction, the legislature is presumed also to adopt prior constructions of the statute by the highest court of that jurisdiction").

### 3.  *Legislative history*

We also consider the legislative history of Oregon's anti-SLAPP statute. As initially introduced, Oregon's anti-SLAPP bill was virtually identical to California's statute. *Compare* Bill File, House Bill (HB) 2460, Oct 17, 2000, *with* Cal Code Civ Proc § 425.16 (West 2001); Tape Recording, House Judiciary Subcommittee on Civil Law, HB 2460, Mar 19, 2001, Tape 41, Side A (remarks of Dave Heynderickx). Initially, subsection (1) of the bill provided, as California's anti-SLAPP statue provided, that a court shall grant a special motion to strike "unless the plaintiff establishes that there is a probability that the plaintiff will prevail on the claim." *Compare* Bill File, HB 2460, Oct 17, 2000, *with* Cal Code Civ Proc § 425.16 (West 2001). Like California's statute, Oregon's bill initially did not provide further guidance on what a plaintiff must show.

At a hearing before the House Judiciary Subcommittee on Civil Law, two members of the Oregon State Bar's Practice and Procedure Committee testified that subsection (1) of the bill was problematic. Tape Recording, House Judiciary Subcommittee on Civil Law, HB 2460, Mar 19, 2001, Tape 44, Side A and Tape 43, Side B (testimony of Mark Morrell and Jeff Johnson). They explained that the use of the word "probability" implied that the plaintiff had to show a likelihood of prevailing and could require a court to weigh the plaintiff's evidence. *Id.* Not only would such a procedure be contrary to existing rules of Oregon civil procedure, but

Civ Proc § 425.16(b)(1) (West 2001). The California statute lacks a section comparable to ORS 31.150(3), which sets out shifting burdens and specifies how a plaintiff can establish a probability of prevailing. *See id.* § 425.16.

dismissing a claim based on a trial court's assessment of the weight of a plaintiff's evidence could violate the plaintiff's constitutional right to a jury trial. *Id.* To avoid those problems, the witnesses suggested that defendants could bring summary judgment motions against SLAPP suits. However, they agreed that summary judgment motions were unlikely to be an effective way of meeting the legislature's goal of bringing a quick end to SLAPP suits. *Id.*

The House Subcommittee proposed amending the bill to meet those concerns. Although the subcommittee retained the requirement in subsection (1) that a plaintiff faced with a special motion to strike must show a probability of prevailing, it proposed two changes. First, it qualified the statement in subsection (1) that a plaintiff establish a probability of prevailing by adding the phrase, "in the manner provided by subsection (3) of this section." Bill File, HB 2460, Apr 20, 2001. Second, the subcommittee added subsection (3), which would have provided:

> "A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section. If the defendant meets this burden, the burden shifts to the plaintiff in the action to make a prima facie showing of facts that would, if proved at trial, support a judgment in favor of the plaintiff on the claim. If the plaintiff meets this burden, the court shall deny the motion."

*Id.* Those amendments avoided the constitutional concerns that the Bar had raised by stating that a plaintiff could prove a "probability" of prevailing by offering sufficient facts to make out a prima facie case—*i.e.*, sufficient facts to meet the plaintiff's burden of production. The subcommittee approved the bill, as amended, which the House Judiciary Committee and later the full House approved.

Representative Schrader carried the bill in the Senate Judiciary Committee. In introducing the bill, he proposed several amendments to it. Tape Recording, Senate Committee on Judiciary, HB 2460, May 15, 2001, Tape 142, Side A. Among other things, Representative Schrader proposed amending the wording of subsection (3) of the bill. *Id.*

The Bar proposed similar but slightly different modifications to subsection (3). *Id.* at Tape 142, Side B (testimony of Bob Olson). Those amendments required the plaintiff "to present substantial evidence to support a prima facie case." Senate Committee on Judiciary, HB 2460, May 15, 2001, Exhibits Q, U, and V (-3, -4, and -5 amendments to HB 2460).

The use of the phrase "substantial evidence" prompted substantial discussion. Tape Recording, Senate Committee on Judiciary, HB 2460, May 15, 2001, Tape 142, Side B (remarks of Sen Courtney). Senator Courtney observed that the proposed amendments appeared to place a "dramatically" greater burden on the plaintiff than the defendant. *Id.* He noted that, under subsection (3) of the bill, a defendant had to make a prima facie showing while the plaintiff had to respond with "substantial evidence." *Id.* The representative from the Bar agreed that the bill required the plaintiff to offer "substantial evidence," but he observed that "the question is what does that mean." *Id.* (Bob Olson). Senator Courtney replied, "Well, we know what that means. That's a whole lot more than a prima facie." *Id.* Senator Courtney added that he was not saying that the proposed wording was wrong, just that the amendment was "very significant" because the phrase "substantial evidence" appeared to place a greater burden on the plaintiff than the defendant. *Id.*

Dave Heynderickx from the Office of Legislative Counsel and representatives from the Bar explained that that had not been their intent. Heynderickx stated that, if the defendant met its burden:

> "then the burden shifts to the plaintiff to come forward at that point and say I've got the goods. I've got something more than just the allegations in my complaint, and I'm not depending on hopefully finding something during discovery. In essence, you have to come forward and show you've got something to support, by affidavit or otherwise, your case."

*Id.* At that point, Senator Minnis interjected and explained that the counsel to the Senate Judiciary Committee had told him that "substantial evidence" merely required "some showing of facts to support the prima facie basis of [the

plaintiff's] case." *Id.* Heynderickx agreed. He clarified that the plaintiff has "to come forward to make a prima facie showing. And what that normally means is just some affidavit or some showing on the elements of your case that you've got something to support it."[11] *Id.*

With that point resolved, the discussion moved to other issues, and the Senate Judiciary Committee amended subsection (3) of the bill to provide:

"A defendant making a special motion to strike under the provisions of this section has the initial burden of making a prima facie showing that the claim against which the motion is made arises out of a statement, document or conduct described in subsection (2) of this section. If the defendant meets this burden, the burden shifts to the plaintiff in the action to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case. If the plaintiff meets this burden, the court shall deny the motion."

Bill File, HB 2460, May 30, 2001 (B-Engrossed Bill). The Senate approved the bill, as amended, and the House acceded to the Senate amendments. House and Senate Journal, Regular Session, 2001, H-95.

The legislative history of HB 2460 establishes that, in amending that bill, the Senate did not intend to depart from the terms of subsection (3) as it emerged from the House. Rather, the Senate agreed that, if a defendant makes a prima facie showing, then the burden shifts to the plaintiff to submit sufficient evidence to make its prima facie case; that is, the plaintiff must submit sufficient evidence from

---

[11] Heynderickx explained that the wording of the amendments had been taken from the California cases. Tape Recording, Senate Committee on Judiciary, HB 2460, May 15, 2001, Tape 142, Side B. The California cases that preceded the adoption of Oregon's anti-SLAPP statute held that, if the defendant showed that the anti-SLAPP statute applied, the plaintiff could establish a "probability" of prevailing by "mak[ing] a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor." *ComputerXpress, Inc. v. Jackson*, 93 Cal App 4th 993, 1010, 113 Cal Rptr 2d 625 (2001); *Church of Scientology v. Wollersheim*, 42 Cal App 4th 628, 646, 49 Cal Rptr 2d 620 (1996) (same); *see Matson v. Dvorak*, 40 Cal App 4th 539, 548, 46 Cal Rptr 2d 880 (1995) (explaining that a plaintiff can establish a "probability" of prevailing by demonstrating that "the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited").

which a reasonable trier of fact could find that the plaintiff met its burden of production. In using terms like "probability" and "substantial evidence," the legislature did not intend to require a plaintiff to do more than meet its burden of production. Conversely, the legislature did not intend that a plaintiff could avoid a special motion to strike by doing less than that.[12]

B.  *Plaintiff's evidence*

In evaluating the sufficiency of plaintiff's evidence, we assume without deciding that the Court of Appeals correctly held that a quorum of a public body can "meet" by means of seriatim communications if each member of the quorum communicates with the other members for the purpose of deciding or deliberating toward a decision—in this case, the decision whether to publicly release the attorney's letter. The difficulty with plaintiff's position is that he failed to meet his burden of production on that issue. No reasonable trier of fact could find from the evidence that plaintiff submitted in response to defendants' special motion to strike that each of the three commissioners (Stewart, Leiken, and Bozievich) decided or deliberated toward deciding whether to release the attorney's letter.

The relevant time period in this case is relatively short. At 2:28 p.m. on May 2, the businessman's attorney emailed a copy of his letter to the Lane County District Attorney. Within two hours, Lane County had received a public records request for the letter. The next morning, at 9:00 a.m., the Lane County Commissioners held a public meeting to decide whether to release the attorney's letter. Within that roughly 18-hour window, two county commissioners (Bozievich and Leiken) and the county administrator exchanged emails. The county administrator also spoke with a third commissioner (Stewart). Those communications

---

[12] The Court of Appeals has relied on California decisions issued after Oregon enacted ORS 31.150 to determine how much evidence a plaintiff must offer to avoid a special motion to strike. However, what our statute means turns on what the Oregon legislature understood in 2001 when it enacted ORS 31.150(3). While the legislature intended to follow the California cases that existed in 2001, California cases decided after 2001 are relevant, at most, only for their persuasive value.

are insufficient, even when aggregated, to meet plaintiff's burden of production.

One of the three commissioners (Leiken) said nothing about disclosing the attorney's letter. Rather, the only communication from Leiken occurred on May 2 at 7:50 p.m. when he emailed a reply to the county administrator's email with a copy to Bozievich and said, "I just read the letter from [the attorney] and I am very concerned as well with regards to the county's potential liability." The question whether Lane County was financially liable as a result of plaintiff's asking donors to make anonymous political contributions is different from the question of how the county commissioners should respond to the media's public records request to release the attorney's letter. Indeed, it was only a year earlier that plaintiff's actions had resulted in the county's being held liable for $350,000, and the attorney's letter posed the possibility that plaintiff's more recent actions also could subject the county to liability. It should come as no surprise that Leiken was concerned that the county could be held liable for additional sums. However, no reasonable trier of fact could find that, in expressing concern that the county could be subject to liability, Leiken was deciding or deliberating toward deciding whether to release the attorney's letter.

To be sure, Leiken had received the county administrator's email in which the administrator expressed her belief that the letter should be released. Even assuming that the administrator was acting as Commissioner Stewart's agent in expressing that belief, Leiken's reply did not address that issue. Rather, he addressed a separate issue. Even if plaintiff can rely on a series of separate communications to establish that each member of a quorum met to decide or deliberate towards deciding an issue, he must show something more than Leiken's passive receipt of the county administrator's email to establish that Leiken deliberated whether to release the attorney's letter. Without something more, Leiken's mere receipt of the county administrator's views on the public records request is not sufficient to permit a reasonable inference that Leiken decided or deliberated toward deciding that issue. Without Leiken, plaintiff lacks a quorum.

Plaintiff's evidence suffers from another problem. The record does not show that Commissioner Stewart ever made any statement orally or by email regarding whether the letter should be released. Rather, all that the record shows is that the county administrator represented in her first email to Commissioners Bozievich and Leiken, which she sent on May 2 at 7:38 p.m., that "Commissioner Stewart asked me about county liability" and that "Commissioner Bozievich had the same concern when I spoke to him earlier." As explained above, the fact that Stewart and Bozievich expressed concerns about county liability does not imply that they discussed whether to release the attorney's letter in response to the public records request. Those are two separate issues.

Admittedly, the county administrator expressed her own view that the attorney's letter should be released. After noting the concern about county liability, she added, in her first email, "*I'm* also concerned that it will look like we are trying to hide something if we refuse the public records request. Our practice is to use the exceptions if they exist, but it feels wrong in this case. I'll consult with counsel on all of those issues and get back to you." (Emphasis added.) Although the county administrator expressed her thoughts regarding releasing the letter, there is nothing in this record to show what Commissioner Stewart thought about that issue. Nor is there anything to show that, in expressing her own thoughts, the county administrator was acting as Stewart's agent or seeking to deliberate on his behalf with Bozievich and Leiken toward a decision whether to comply with the public records request. Any conclusion that the county administrator was acting as Stewart's agent is mere speculation.

Finally, we note that, as the county has argued, the district attorney initially made the decision whether to release the attorney's letter in response to the public records request. He either had not made or had not communicated that decision before 7:09 a.m. on May 3, less than two hours before the Commission held a public emergency meeting at 9:00 a.m. Because the decision to release the letter was initially the district attorney's, it is less likely that any of the

commissioners would have sought to decide that issue before they found out what his decision was. Admittedly, at some point after 7:09 a.m. on May 3, the county administrator learned that the district attorney was going to invoke the exception and not release the letter. At some point between 7:09 a.m. and 9:00 a.m. on May 3, the county administrator conferred with Commissioners Leiken and Bozievich to decide whether to hold an emergency meeting, and she spoke with Commissioner Stewart before doing so. It is not impossible that, in discussing whether to call an emergency meeting, the county administrator spoke to Stewart, Leikin, and Bozievich about the merits of the meeting. However, no evidence in the record points in that direction, and plaintiff is left with nothing other than speculation to fill in the gaps in his evidence.

We note one final evidentiary point. It is clear that the county administrator spoke with Leikin and Bozievich about whether to hold the emergency meeting, and a trier of fact reasonably could infer that she spoke to Stewart about the same issue. However, the Court of Appeals held that the decision whether to hold an emergency meeting was not subject to Oregon's public meetings law, and plaintiff has not challenged that decision on review. Plaintiff has not met his burden to produce evidence from which a reasonable trier of fact could find that a quorum of the commissioners met privately to decide or deliberate toward deciding whether to release the attorney's letter.

One issue remains. As noted above, the trial court denied a request for further discovery that plaintiff had included in his response to defendant's motion to strike. *See* ORS 31.152(2).[13] Plaintiff assigned error to that ruling on appeal, but the Court of Appeals found it unnecessary to reach it because it concluded that plaintiff had introduced sufficient evidence regarding the second part of his second claim for relief to meet his burden of production. Because we

---

[13] Oregon's anti-SLAPP statute provides that "[a]ll discovery in the proceeding shall be stayed upon the filing of a special motion to strike under ORS 31.150" and that "[t]he stay of discovery shall remain in effect until the entry of judgment." ORS 31.152(2). However, subsection (2) also provides that the trial court, "on motion and for good cause shown, may order that specified discovery be conducted notwithstanding the stay imposed by this subsection." *Id.*

have reached a different conclusion, we remand the case to the Court of Appeals so that it can consider whether plaintiff showed good cause for conducting further discovery and, if he did, whether the trial court abused its discretion in denying his request.

### III.   CONCLUSION

Plaintiff's first claim for relief challenged defendants' decisions regarding notice, holding an emergency meeting, and not providing minutes. The Court of Appeals held that those decisions were not subject to a special motion to strike under Oregon's anti-SLAPP statute and, for that reason, reversed the trial court's judgment on that claim. Defendants do not challenge that part of the Court of Appeals decision.

Plaintiff's second claim for relief alleged that defendants had violated the public meetings law by deciding or deliberating toward deciding (1) whether to hold an emergency meeting and (2) whether to release the attorney's letter. The Court of Appeals held that the first decision—whether to hold an emergency meeting—was not subject to the public meetings law, and plaintiff has not challenged that holding on review. Regarding the second decision, we have concluded that plaintiff failed to offer sufficient evidence from which a reasonable trier of fact could find that defendants met privately to decide or deliberate toward deciding whether to release the letter. We reverse the Court of Appeals decision regarding that aspect of plaintiff's second claim and remand so that it can consider whether the trial court abused its discretion in denying plaintiff's request for further discovery.

The trial court dismissed plaintiff's third claim for injunctive relief because it depended on the first two claims for relief. The Court of Appeals reversed the trial court's judgment on that claim, presumably so that the trial court could reevaluate its ruling in light of the Court of Appeals decision. Neither party has challenged that part of the Court of Appeals' ruling.[14]

---

[14] The trial court also awarded defendant's costs and attorney fees pursuant to ORS 31.150. The Court of Appeals reversed that award, and neither party has challenged that ruling on review.

The decision of the Court of Appeals is affirmed in part and reversed in part. The case is remanded to the Court of Appeals for further consideration consistent with this decision.